# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WASHINGTON TENNIS & EDUCATION )
FOUNDATION, INC., )
                              )
         Plaintiff, )
                              )      Civil Action No. 1:15-cv-02254-APM
v. )
                              )
CLARK NEXSEN OWEN BARBIERI )
AND GIBSON, P.C., et al., )
                              )
         Defendants. )

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

James W. Walker (DC Bar 495552)
Stephan F. Andrews (DC Bar 497228)
J. Brandon Sieg (admitted *pro hac vice*)
VANDEVENTER BLACK LLP
901 E. Byrd Street, Suite 1600
Richmond, VA 23219
Phone: (804) 237-8800
Fax: (804) 237-8801
jwalker@vanblacklaw.com
sandrews@vanblacklaw.com
bsieg@vanblacklaw.com
*Counsel for Defendants / Counter-Plaintiffs*

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

I.     Introduction ...................................................................................................... 1

II.    Standard of Review .......................................................................................... 4

III.   Applicable Law ................................................................................................. 5

       A.    Constitutional and Prudential Standing Are Essential to a Federal Court's Subject
             Matter Jurisdiction ................................................................................ 5

             i.     Constitutional Standing ................................................................. 5

             ii.    Prudential Standing ....................................................................... 6

       B.    Lack of Constitutional or Prudential Standing Can Be Raised Either Through a
             Motion to Dismiss Under Rule 12(b)(1) or Through a Motion for Summary
             Judgment Under Rule 56 ........................................................................ 7

             i.     The Plaintiff Always Bears the Burden of Establishing Subject Matter
                    Jurisdiction ........................................................................... 7

             ii.    Challenges to Subject Matter Jurisdiction May Be Asserted Through a
                    Motion to Dismiss Under Rule 12(b)(1) ....................................... 8

             iii.   Challenges to Subject Matter Jurisdiction May Also Be Asserted Through
                    a Motion for Summary Judgment Under Rule 56 ......................... 9

       C.    As a Distinct Legal Entity, a Corporation Lacks Standing to Assert Claims on
             Behalf of Other, Associated Entities Within Its Corporate Family ...................... 10

       D.    Leave to Amend Under Rule 15 Is Unavailable to a Plaintiff Without Standing
             Because the Court Lacks Subject Matter Jurisdiction over the Entire Matter ....... 10

       E.    Leave to Amend Under Rule 17 Is Unavailable Absent an Honest and
             Understandable Mistake About the Identity of the Real Party in Interest ............ 12

       F.    Statute of Limitations ........................................................................... 14

             i.     Summary of the Applicable Statute of Limitations ....................... 14

             ii.    The Discovery Rule Applies Only in Unique and Limited
                    Circumstances ....................................................................... 15

G.      Consequential Damages for Breach of Contract ........................................... 17

H.      The Economic Loss Rule ............................................................................... 19

IV.   Argument ..................................................................................................................... 21

A.      WTEF Lacks Standing to Assert the Claims in this Lawsuit ......................... 21

i.      WTEF and WTEF East Are Separate Entities ................................... 21

ii.     WTEF Assigned All of Its Right, Title and Interest in the Architect
        Agreement to WTEF East ................................................................... 23

iii.    WTEF Lacks Standing to Assert Any of Its Claims Against CNOBG ...... 26

B.      There Is No Basis for Granting WTEF Leave to Amend Its Complaint to Cure Its
        Lack of Standing ........................................................................................... 28

C.      Count II Is Barred by the Economic Loss Rule ............................................. 32

D.      WTEF's Claims Are Barred by the Statute of Limitations ............................ 33

i.      WTEF Filed Its Complaint More than Three Years After Its Causes of
        Action Accrued .................................................................................... 33

ii.     The Discovery Rule Does Not Apply Under These Facts ..................... 38

iii.    Even if the Discovery Rule Was Applied, WTEF's Causes of Action
        Would Still Be Barred by the Statute of Limitations ........................... 39

E.      WTEF Waived Recovery of Consequential Damages Against CNOBG ............. 40

F.      WTEF Cannot Prove Its Case Without Expert Testimony to Establish a Breach of
        the Applicable Standard of Care ................................................................... 42

V.    Conclusion .................................................................................................................. 43

TABLE OF AUTHORITIES

STATUTES

U.S. Const. art. III ....................................................................................... 5, 7, 26-27

D.C. Code § 12-301 ...........................................................................................14, 33

FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12 ................................................................................................. 7-9

Fed. R. Civ. P. 15 ................................................................................... 10-12, 14, 30

Fed. R. Civ. P. 17 ....................................................................................12-14, 31-32

Fed. R. Civ. P. 56 ............................................................................................... 4-7, 9

CASES

*Aguilar v. RP MRP Washington Harbour, LLC*,
    98 A.3d 979 (D.C. 2014) ......................................................................... 19-20

*Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*,
    62 F. Supp. 3d 114 (D.D.C. 2014) ................................................................8

*Amgen, Inc. v. Scully*,
    234 F. Supp. 2d 9 (D.C. Cir. 202) .......................................................... 6,-7

*A.P. Woodson Co. v. Sakran*,
    129 A.2d 175 (D.C. 1957) ...........................................................................18

*Aronoff v. Lenkin Co.*,
    618 A.2d 669 (D.C. 1992) ...........................................................................20

*Bay Gen. Indus., Inc. v. Johnson*,
    418 A.2d 1050 (D.C. 1980) .........................................................................18

*Bradley v. Dist. of Columbia Pub. Schools*,
    No. 14-cv-01444 (APM), 2016 WL 6464471 (D.D.C. Nov. 1, 2016)...............5

*Briggs v. Washington Metropolitan Area Transit Auth.*,
    481 F.3d 839 (D.C. Cir. 2007) ....................................................................42

*Capitol Place I Assoc. L.P. v. George Hyman Constr. Co.*,
    673 A.2d 194 (D.C. 1996) ...................................................................... 14-17, 38-39

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548 (1986) ................................................................. 5, 9

*Colbert v. Georgetown Univ.*,
    641 A.2d 469 (D.C. 1994) .................................................................................... 17

*Deutsche Bank Nat. Trust Co. v. F.D.I.C.*,
    717 F.3d 189 (D.C. Cir. 2013) ......................................................................... 7, 27

*Dist. of Columbia v. Arnold & Porter*,
    756 A.2d 427 (D.C. 2000) .................................................................................... 42

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
    476 U.S. 858, 106 S. Ct. 2295 (1986) ................................................................. 19

*Ehrenhaft v. Malcolm Price, Inc.*,
    483 A.2d 1192 (D.C. 1984) .......................................................................... 14-16, 38-40

*Evans v. Dist. of Columbia*,
    No. 1:14-cv-01652 (APM), 2016 WL 7017255 (D.D.C. Dec. 1, 2016) ...................... 4- 5

*Fererro v. W.U. Tel. Co.*,
    9 App. D.C. 455 (1896) ....................................................................................... 17

*Fowler v. A&A Co.*,
    262 A.2d 344 (D.C. 1970) .................................................................................... 17

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) ........................................................................... 8, 9

*Hadley v. Baxendale*,
    (1854) 156 Eng. Rep. 145 (Ex.) ...................................................................... 17-18

*Hansel Phelps Constr. Co. v. Cooper Carry, Inc.*,
    No. 15-1961, 2016 WL 5415621 (D.D.C. Sept. 28, 2016) ................................ 3, 14-15, 34

*Hoai v. Sun Ref. & Mktg. Co.*,
    No. 87-2456-LFO, 1991 WL 530756 (D.D.C. May 2, 1991) .................................... 18

*Jefferson v. Collins*,
    905 F. Supp. 2d 269 (D.D.C. 2012) .................................................................... 20

iv

*Kokkonen v. Guardian Life Insurance Co. of Am.*,
    511 U.S. 375, 114 S. Ct. 1673 (1994) ........................................................................7, 26

*Lans v. Gateway 2000, Inc.*,
    84 F. Supp. 2d 112 (D.D.C. 1999) ............................................3, 10-14, 18, 28, 30-32

*Lexmark Intern. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ..............................................................................................7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, 112 S. Ct. 2130 (1992) ..............................................................5-6, 8-9, 26

*Menna v. Plymouth Rock Assurance Corp.*,
    987 A.2d 458 (D.C. 2010) ..........................................................................................14

*Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*,
    868 F. Supp. 346 (D.D.C. 1994) ................................................................................19

*Pulte Home Corp. v. Parex, Inc.*,
    174 Md. App. 681 (Md. Ct. Spec. App. 2007) ............................................................21

*Sears, Roebuck & Co. v. Goudie*,
    290 A.2d 826 (D.C. 1972) ..............................................................................18, 41, 42

*Sec. Indus. and Fin. Markets Ass'ns v. U.S. Commodity Futures Trading Comm'n*,
    67 F. Supp. 3d 373 (D.D.C. 2014) ..............................................................10, 23, 27

*Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*,
    236 Va. 419, 374 S.E.2d 55 (1998) ............................................................................20

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
    454 U.S. 464, 102 S. Ct. 752 (1982) ..........................................................................7

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) ....................................................................................6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WASHINGTON TENNIS & EDUCATION ) 
FOUNDATION, INC., )
  )
      Plaintiff, )
  )     Civil Action No. 1:15-cv-02254-APM
v. )
  )
CLARK NEXSEN OWEN BARBIERI )
AND GIBSON, P.C., et al., )
  )
      Defendants. )

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

The Defendants, Clark Nexsen Owen Barbieri and Gibson, P.C. and Clark Nexsen, Inc., (collectively "CNOBG")[1] jointly by their counsel, state as follows in support of their Motion for Summary Judgment:

## I.     Introduction

This architecture professional malpractice action was filed by a single entity, Washington Tennis & Education Foundation, Inc. ("WTEF"), on November 10, 2015.  But previously, in December of 2011, WTEF assigned, transferred and conveyed all of its "right, title and interest" in the contract underlying this lawsuit to its affiliated entity, Washington Tennis and Education Foundation East, Inc. ("WTEF East").  In light of that assignment, WTEF lacks standing to assert the claims alleged in the Complaint.

There is no basis for permitting WTEF to amend its Complaint under Rule 15 or for permitting WTEF East to ratify, join, or be substituted into the action under Rule 17.  The

---

[1]     Clark Nexsen Owen Barbieri and Gibson, P.C. changed its name to Clark Nexsen, Inc. in March 2014.

individuals involved in filing WTEF's Complaint were clearly aware of the WTEF East entity and of the assignment.  For example, the Complaint was filed by an attorney, Peter B. Work, who had previously received a copy of a mediation demand from WTEF East to CNOBG identifying the same issues alleged in the Complaint.  The Complaint itself was verified by WTEF's President, Eleni Rossides, who had previously asked CNOBG to consent to WTEF's assignment of its interest in the contract to WTEF East.  Eleni Rossides, like Peter Work, also received a copy of WTEF East's mediation demand before WTEF's Complaint was filed.  Yet the claims previously asserted by WTEF East in the mediation demand were nevertheless asserted solely by WTEF in the Complaint.  The WTEF East entity was referenced only vaguely in Paragraph 3 of the Complaint, and WTEF made no other mention of WTEF East in either its Complaint, in its initial disclosures, or in its response to interrogatories asking about the basis of WTEF's claims and damages.

WTEF never produced an executed copy of the document assigning its interest to WTEF East, but CNOBG eventually obtained a copy of that document from WTEF East's lender through a subpoena duces tecum.  WTEF instead denied—boldly—both that its interest was assigned and that it was a separate and distinct entity from WTEF East.  WTEF persisted in its denials even after CNOBG presented the executed copy of WTEF's assignment agreement to WTEF's current counsel.  WTEF further advanced its denials in filings with this Court when CNOBG challenged the good faith of WTEF's legal position.  *See* Pl.'s Resp. (ECF No. 36).

These facts demonstrate that although WTEF's decision to pursue these claims solely in its own name is inexplicable, WTEF's decision was nevertheless intentional.  After all, WTEF made the parallel decision to sue CNOBG under *both* CNOBG's current name *and* CNOBG's prior name.  WTEF also omitted any reference to WTEF East from its initial disclosures and

responses to interrogatories, but WTEF subsequently testified that WTEF East actually paid

some of the utility bills for which WTEF is now seeking damages in this action.  The decision to

omit WTEF East from this lawsuit was not the result of any honest and understandable mistake.

And there is no common law duty that could allow WTEF's breach of contract claim, for which

it lacks standing, to survive independently under Count II's tort theory.  WTEF's claims against

CNOBG should be dismissed with prejudice for lack of standing.  *See Lans v. Gateway 2000,*

*Inc.*, 84 F. Supp. 2d 112, 120 (D.D.C. 1999).

In addition to WTEF's lack of standing, WTEF's claims are barred by the applicable

statute of limitations, which is three years.  To survive, WTEF's cause of action cannot have

accrued before November 10, 2012.  CNOBG not only completed its design of the building at

issue in this litigation (the "Facility") before November 10, 2012—the Facility was also

constructed and *occupied* by WTEF by November of 2012.  Because WTEF's claims about

errors and omissions in CNOBG's design services arose well before the Facility was constructed

and occupied, they are barred by the statute of limitations.  *See Hansel Phelps Construction Co.*

*v. Cooper Carry Inc.*, No. 15-1961, 2016 WL 5415621 (D.D.C. Sept. 28, 2016).  WTEF's claims

for construction issues that were constructed before November of 2012 are similarly barred,

including WTEF's claim that CNOBG failed to notify WTEF about the contractor's

misalignment of the storefront wall.

Section 8.1.3 of the contract underlying this lawsuit ("Architect Agreement") expressly

waived recovery of consequential damages by either party.  WTEF's disappointed expectations

in the monthly cost of utility bills is not the natural result of any breach of contract by CNOBG.

WTEF's claims for damages relating to the cost of utility bills are waived by § 8.1.3 because

there was no requirement in the contract to provide a design that would accommodate any target

3

monthly operating budget for the Facility.  Accommodating WTEF's expectations about the monthly cost of utilities would require special knowledge beyond the express terms of the Architect Agreement.  To the extent WTEF could even prove that CNOBG had such special knowledge about WTEF's subjective expectations, any claims relating to utility bills are consequential damages waived by § 8.1.3.

Finally, CNOBG is filing a contemporaneous motion in limine to exclude the expert opinion testimony of WTEF's experts, Jeffrey M. Stoiber and John Farrell, about any breach of the applicable standard of care.  These are the only two testifying experts disclosed by WTEF.  As set forth in CNOBG's motion in limine and incorporated here by reference, one of these experts testified during his deposition that he was never asked to opine about the applicable standard of care, and the other expert was unable to describe any factual basis for his opinions.  WTEF cannot prove liability at trial without expert testimony opining on a breach of the applicable standard of care, and WTEF has no admissible evidence to offer on this topic.

For these reasons and as set out in greater detail below and in CNOBG's Statement of Undisputed Material Facts, CNOBG moves this Court to grant summary judgment in CNOBG's favor and dismiss all of WTEF's claims with prejudice.

## II.        Standard of Review

A party is entitled to summary judgment in its favor "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  "A dispute is 'genuine' only if a reasonable fact-finder could find for the nonmoving party, and a fact is 'material' only if it is capable of affecting the outcome of litigation."  *Evans v. District of Columbia*, No. 1:14-cv-01652 (APM), 2016 WL 7017255, at *2

(D.D.C. Dec. 1, 2016).  Rule 56(c)(1)(A) permits a party to support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, … admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(B) also permits a party to support its factual position by showing that "an adverse party cannot produce admissible evidence to support the fact."

Under Rule 56, summary judgment must also be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case … on which that party will bear the burden of proof at trial."  *Id.* at *3 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)); *see also Bradley v. District of Columbia Public Schools*, No. 14-cv-01444 (APM), 2016 WL 6464471, at *2-3 (D.D.C. Nov. 1, 2016).  The party moving for summary judgment on such an issue bears the initial burden of informing the Court of the basis of its motion, but the burden then shifts to the party opposing the motion to set forth evidence on which the jury could reasonably find for the non-moving party.  *Id.*

### III.   Applicable Law

**A.   Constitutional and Prudential Standing Are Essential to a Federal Court's Subject Matter Jurisdiction**

*i.   Constitutional Standing*

Article III of the U.S. Constitution establishes authority for the federal courts to adjudicate "Cases" and "Controversies," but the Constitution does not define those terms or the "judicial Power" that it delegates.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). The federal courts rely upon landmarks "to identify those disputes which are appropriately resolved through the judicial process."  Id., 504 U.S. at 560, 112 S. Ct. at 2136 (citations

5

omitted).  The doctrine known as "constitutional standing" is not only one of these landmarks; it

"is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Id.*

The following three elements must be present for a plaintiff to establish constitutional

standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized, … and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical,'"….  Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to be
> "fairly trace[able] to the challenged action of the defendant, and not … th[e] result
> [of] the independent action of some third party not before the court." … Third, it
> must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Id.* (citations omitted); *see Williams v. Lew*, 819 F.3d 466, 475 (D.C. Cir. 2016) (summarizing

these three elements as "injury-in-fact, traceability, and redressability").

These three elements of standing are "an indispensable part of the plaintiff's case, [and]

each element must be supported in the same way as any other matter on which the plaintiff bears

the burden of proof …"  *Lujan*, 504 U.S. at 561.  "If … a litigant who commences suit fails to

show actual or imminent harm that is concrete and particular, fairly traceable to the conduct

complained of, and likely to be redressed by a favorable decision, the Federal Judiciary cannot

hear the claim."  *Williams*, 819 F.3d at 475.


ii.    *Prudential Standing*

In addition to the three foundational elements of constitutional standing, the federal

courts have also developed self-imposed limits on their jurisdiction known as "prudential

standing."  *Amgen, Inc. v. Scully*, 234 F. Supp. 2d 9, 16 (D.D.C. 2002).  This set of prudential

considerations includes the principle that a "plaintiff generally must assert his own legal rights

and interest, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.*

(citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S. Ct. 752 (1982)); *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-87 (2014) (distinguishing prudential standing from statutory interpretation of a legislatively conferred cause of action).  This prudential principle applies "even where a plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement of Article III."  *Scully*, 234 F. Supp. 2d at 16.  Because prudential standing is itself "a threshold, jurisdictional concept," federal courts may consider the issue before considering Article III standing or even as an alternative holding.  *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 717 F.3d 189, 194, n.4 (D.C. Cir. 2013).

Underlying this rule is a belief that "courts should avoid adjudicating the rights of parties not before them," and it ensures that "the most effective advocate of the rights at issue is present to champion them."  *Scully*, 234 F. Supp. 2d at 17 (citations omitted).  As recognized by the D.C. Circuit, "[w]hen a party is neither party to nor an intended beneficiary of a contract, then any claim brought under that contract must belong to a third party."  *Deutsche Bank*, 717 F.3d at 194, n.5.  Such a litigant lacks prudential standing to bring a claim under the contract, and federal courts lack jurisdiction to adjudicate the claim.  *See id.*, 717 F.3d at 194.


**B.**     **Lack of Constitutional or Prudential Standing Can Be Raised Either Through a Motion to Dismiss Under Rule 12(b)(1) or Through a Motion for Summary Judgment Under Rule 56**

     *i.*     *The Plaintiff Always Bears the Burden of Establishing Subject Matter Jurisdiction*

As courts of limited jurisdiction, the federal courts presume "that a cause lies outside this limited jurisdiction, … and the burden of establishing the contrary rests with the party asserting jurisdiction."  *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 377, 114 S.

Ct. 1673, 1675 (1994).  Because the elements of standing "are not merely pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." … In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," … which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

*Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137 (citations omitted).


ii.     *Challenges to Subject Matter Jurisdiction May Be Asserted Through a Motion to Dismiss Under Rule 12(b)(1)*

When a challenge to a federal court's subject matter jurisdiction is raised by a motion to dismiss, "the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *American Orthotic & Prosthetic Association, Inc. v. Sebelius*, 62 F. Supp. 3d 114, 120 (D.D.C. 2014). Under a Rule 12(b)(1) motion to dismiss, a court also "may consider materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *Id.*  Yet a Rule 12(b)(1) motion still requires a court to construe the complaint in favor of the complaining party.  *Haase v. Sessions*, 835 F.2d 902, 328-230 (D.C. Cir. 1987).

### iii. Challenges to Subject Matter Jurisdiction May Also Be Asserted Through a Motion for Summary Judgment Under Rule 56

Although the U.S. Court of Appeals for the District of Columbia Circuit concluded that a 12(b)(1) motion to dismiss may not be converted into a motion for summary judgment, it also held that the absence of such a conversion feature "*does not* preclude a defendant from challenging standing via a motion for summary judgment." *Haase*, 835 F.2d at 906-07.

Under Rule 56(a), summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." But in responding to such a motion challenging subject matter jurisdiction, the burden rests on the plaintiff to affirmatively substantiate its standing (and the court's jurisdiction) with evidence beyond the naked allegations of its complaint. *See Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137. This is consistent with established interplay between the burden of production and the burden of persuasion under Rule 56:

> The burden of production under Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. … The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. …
>
> If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment must satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. … If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S. Ct. 2548, 2557 (1986).

**C.**     **As a Distinct Legal Entity, a Corporation Lacks Standing to Assert Claims on Behalf of Other, Associated Entities Within Its Corporate Family**

"As a general rule, two separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other." *Securities Industry and Financial Markets Association v. U.S. Commodity Futures Trading Commission*, 67 F. Supp. 3d 373, 406 (D.D.C. 2014) (citations omitted).

It is well established that a corporation cannot bring a suit on behalf of another member of its extended corporate family, even when the business of the two entities is intertwined. *Securities Industry and Financial Markets Association*, 67 F. Supp. 3d 373, 407 (D.D.C. 2014) ("a subsidiary cannot bring a suit on behalf of its parent, let alone other members of its extended corporate family") (citing federal court opinions from around the country in support of this proposition).  Any other rule would allow corporations to "hav[e] their cake and eat[] it too." *See id.*, 67 F. Supp. 3d at 406.  In exchange for the benefits of adopting the corporate form, a corporation must remain distinct from its affiliated entities—even when it is inconvenient for the corporation to do so.  *Id.*, 67 F. Supp. 3d at 406-07 *see also Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 123 n.10 (D.D.C. 1999) ("Furthermore, the law generally does not allow the option of 'reverse piercing' the corporate veil when it suits the corporation's owner.").

**D.**     **Leave to Amend Under Rule 15 Is Unavailable to a Plaintiff Without Standing Because the Court Lacks Subject Matter Jurisdiction over the Entire Matter**

Rule 15 identifies specific circumstances under which a party may amend its pleadings. Under Rule 15(a)(1), a party may amend its pleading once as a matter of course either (A) within 21 days of service of the pleading or (B) within 21 days after service of a required response to that pleading.  Under Rule 15(a)(2), a party may amend its pleading "only with the opposing

party's written consent or the court's leave," which should be freely given by the court "when justice so requires."

Notwithstanding this liberal approach to granting leave to amend, Rule 15 does *not* grant discretion to a federal court to allow a plaintiff without standing to substitute a different party with standing in its place to preserve the action. This is because "if a plaintiff lacks standing to be before the court from the time of the filing of the original complaint, there is no action for him to amend, since the court is deprived of subject matter jurisdiction over the entire matter." *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 116-17 (D.D.C. 1999).

*Lans* was a patent infringement case filed by the sole shareholder of a corporation in the shareholder's own name. *See* 84 F. Supp. 2d at 113, n.2 (confirming that Lans was the sole shareholder of the corporation). The *Lans* plaintiff asserted the action on his own behalf as the owner of the patent without disclosing the fact that he had previously assigned his entire "right, title, and interest" in the patent to his corporation. When this assignment came to light in the course of discovery, the plaintiff offered a variety of excuses for failing to bring the action in the name of his corporation, including that he forgot about the assignment, that the assignment was invalid, and that the attorney who prepared the assignment had died. *See id.* at 114, 121, 120 n.7.

Notwithstanding these excuses and explanations, the U.S. District Court for the District of Columbia refused to grant the plaintiff leave to amend under Rule 15(a). The Court expressly adopted the rule that a "plaintiff may not amend the complaint to substitute a new plaintiff in order to cure a lack of jurisdiction, because a plaintiff may not create jurisdiction by amendment when none exists." *Id* at 115. This Court recognized that its approach was "consistent with the purpose of Rule 15(a) since the intent of the rule is to assist in the disposition of litigation on the

merits of the case rather than have pleadings become ends in themselves." *Id.* at 117 (citations omitted).

Rule 15 does not permit a plaintiff to retroactively establish subject matter jurisdiction at the summary judgment stage of litigation by introducing a new plaintiff through an amendment to the complaint. Rule 15(a)'s instruction that the "court should freely give leave [to amend] when justice so requires" does not reach that far.

**E.      Leave to Amend Under Rule 17 Is Unavailable Absent an Honest and Understandable Mistake About the Identity of the Real Party in Interest**

An alternate theory advanced by plaintiffs who lack standing is to request leave to amend to substitute a different party under Rule 17(a)(3). Rule 17(a)(1) requires that "[a]n action must be prosecuted in the name of the real party in interest," but Rule 17(a)(3) instructs that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."

The plaintiff in *Lans* advanced this very argument, but it too was rejected by the Court. The Court discussed the advisory committee's notes, which recognized that the origin of Rule 17 was to permit an *assignee* to sue in its own name, and that the modern function of the rule "is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." *Id.* at 119. Rule 17 "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made," but it does not permit substitution of the correct party to "take advantage of the suspension of the limitations period" if

there was a good-faith belief at the time of filing that the named plaintiff was a real party in interest.  *See id.* at 119-20 (quoting the advisory committee notes).

"It is appropriate to liberally grant leave to substitute a real party in interest … when … determination of the proper party was somehow difficult at the time of the filing of suit, or that the mistake is otherwise understandable."  *Id.* at 120.  But it is also "evident that Rule 17(a) should not be applied blindly to permit substitution of the real party in interest in every case…. Plaintiff must first establish that when he brought [the] action in his own name, he did so as the result of an honest and understandable mistake."  *Id.* (citations omitted).  In *Lans*, this Court adopted the "honest and understandable mistake" test to evaluate the plaintiff's motion to amend under Rule 17(a).  *Id.*

Simply "forgetting" about the assignment of an interest is not sufficient to meet this Court's Rule 17(a) standard, nor that of other federal courts.  *Id.* (discussing a case from New York denying substitution under Rule 17 of an active corporation as the real party in interest in place of an improperly named corporation that had been dissolved).  Justice is not served by rewarding plaintiffs for their own "failures, oversights and misrepresentations by permitting an amendment of their pleadings."  *Id.* (citations omitted).

Another material consideration in *Lans* was that the assignment was consequential.  *Id.* at 121.  The Court remarked that "[s]ince Lans was clear on the distinction between himself and the corporation when it came to the tax benefits of having [his corporation] handle the licensing of the patent to IBM, he was on notice that the distinction carried over to other aspects of the patent, *such as which party could properly sue for its infringement*."  *Id.* n.8 (emphasis added).

Based on the totality of the circumstances, the Court could not conclude that the plaintiff's failure to sue in the name of the corporation holding the patent was "an honest and

understandable mistake." *Id.* at 122.  The plaintiff had adequate "ability to verify the validity of the assignment, establish ownership of the patent, and sue in the name of the proper plaintiff." *Id.*  Because the plaintiff chose instead to conceal the assignment, his failure to sue in the name of the proper party was not an honest and understandable mistake.  The plaintiff's motion to amend under Rule 17(a), like his motion to amend under Rule 15(a), was denied by the Court.


**F.      Statute of Limitations**

  *i.        Summary of the Applicable Statute of Limitations*

The District of Columbia applies a three-year statute of limitations to professional malpractice claims against design professionals, notwithstanding whether those claims are alleged as a breach of contract or as the negligent performance of a common law duty.  D.C. Code § 12-301 (providing three-year statutes of limitations on actions for simple contract, on actions for injury to real or personal property, and on actions "for which a limitation is not otherwise specially prescribed").

This three-year limitations period begins to run "from the time the right to maintain the action accrues."  D.C. Code § 12-301.  Causes of action for breach of contract generally accrue when the contract is breached, and causes of action for negligence generally accrue when injury results from the negligence.  *See Capitol Place I Associates L.P. v. George Hyman Construction Co.*, 673 A.2d 194, 198 (D.C. 1996), *abrogation on other grounds recognized by Menna v. Plymouth Rock Assurance Corp.*, 987 A.2d 458 (D.C. 2010); *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1198-99 (D.C. 1984).

A design services contract can be breached before all of the architect's or engineer's obligations under the contract have been completed.  In *Hansel Phelps Construction Co. v.*

*Cooper Carry, Inc.*, 2016 WL 5415621 (D.D.C. Sept. 28, 2016), this Court held that the statute of limitations began to run when the plaintiff contractor accepted the defendant architect's flawed design—not when the flaws of the design were discovered or when the architect completed all of its contracted services.

*Hansel Phelps* also drew a distinction between a phased design services contract and a "unitary construction contract," which would establish a solitary obligation to deliver the entire construction project in conformance with the contract. Because no breach can occur under a unitary construction contract until the time for performance (i.e., delivery of the completed construction project), the statute of limitations would begin to run under such a contract at substantial completion. By contrast, design services contracts specifying phased services do not rely on substantial completion to trigger the statute of limitations. The statute of limitations under a phased-services design contract begins to run whenever the architect or engineer breached one of its design obligations. *Id.*, 2016 WL 5415621, at *4.

ii.     *The Discovery Rule Applies Only in Unique and Limited Circumstances*

In some professional malpractice actions, the D.C. Court of Appeals has also applied the "discovery rule" to toll the accrual of a cause of action until "the plaintiff knows or through the exercise of due diligence should have known of the injury." *Ehrenhaft*, 483 A.2d at 1201 (citations omitted); *see also Capitol Place I*, 673 A.2d at 199.

The plaintiff in *Ehrenhaft* was a lay individual who contracted for the design and construction of an addition to his house. The D.C. Court of Appeals concluded that the accrual of these causes of action "based on tort and contract claims arising out of allegedly deficient design and construction of an addition to a house" should be tolled under the discovery rule until

that homeowner knew or should have known of his injury.  *Id.* at 1203.  But this holding was expressly limited to the facts of that case.  *Id.* at 1204.  In reaching its holding, the D.C. Court of Appeals considered factors including: (1) that it would be unreasonable to require a lay homeowner to "engage yet another professional to oversee the work as it is performed"; (2) difficulty in recognizing latent defects (in that case, lack of insulation around pipes within a wall, improperly installed windowpanes, and improperly installed heater); (3) assumption that a "plaintiff who will benefit by invocation of the discovery rule will not be one who has 'sat' on his rights to gain legal advantage"; and (4) recognition that a strict application of the statute of limitations under those facts would deter future parties from attempting to resolve their dispute before engaging in litigation "as a last resort."  *Id.* at 1202-03.

The D.C. Court of Appeals revisited its *Ehrenhaft* analysis in *Capitol Place I*, which involved the construction of a commercial construction project.  673 A.2d, at 200.  At the outset of its analysis, the court assumed—without deciding—that the discovery rule would also apply to commercial construction disputes.  Even with that assumption, the court still held that the discovery rule did not apply to the facts of that case.  *Id.*

Unlike *Ehrenhaft*, the plaintiff in *Capitol Place I* was a sophisticated owner in partnership with a developer that had "extensive knowledge of commercial construction," and early signs of the construction defects were "abundant."  *Id.*  This plaintiff "had actual knowledge of injury to its building more than three years before it filed the demand [for arbitration]."  And although the plaintiff argued that it did not have knowledge of *all* of the alleged defects more than three years before filing its demand, the D.C. Court of Appeals disagreed that a plaintiff who had knowledge of some injury may "defer institution of suit and

wait and see whether additional injuries come to light." *Capitol Place I*, 673 A.2d at 200

(quoting *Colbert v. Georgetown University*, 641 A.2d 469, 473 (D.C. 1994)).

Beyond the narrow and unique circumstances addressed in *Ehrenhaft*, which involved a

lay homeowner asserting claims for a latent defect in a residential project, a plaintiff may not

rely on the discovery rule to delay accrual of its cause of action against an architect or engineer.


**G.     Consequential Damages for Breach of Contract**

The District of Columbia Court of Appeals follows the longstanding contract damages

rule set forth in *Hadley v. Baxendale*:

> When two parties have made a contract which one of them has broken, the damages
> which the other party ought to receive in respect of such breach of contract should
> be such as may fairly and reasonably be considered either arising naturally, i.e.,
> according to the usual course of things from such breach of contract itself, or such
> as may reasonably be supposed to have been in the contemplation of both parties at
> the time they made the contract, as the probable result of the breach of it.

*Fowler v. A&A Co.*, 262 A.2d 344, 349 (D.C 1970).

Courts across the country quote *Hadley v. Baxendale*, but a practical definition to

distinguish "direct" contract damages from "consequential" contract damages remains elusive.

One of the more precise explanations of this rule in the District of Columbia also comes from the

nineteenth century:

> The rule of damages in *Hadley v. Baxendale* is divided into two branches. The first,
> that damages may be recovered if they are the direct, natural, and proximate result
> of the breach of the contract; second, that indirect or special damages may be
> recovered if they can be reasonably supposed to have been in the contemplation of
> both parties when making the contract as likely to result from its breach. Both
> branches of the rule are subject, of course, to this limitation and restriction, that the
> damages claimed, whether as the direct result of the breach of contract or
> negligence, or as special and consequential damages, must be certain and not
> remote, speculative, or contingent.

*Fererro v. W.U. Tel. Co.*, 9 App. D.C. 455 (1896).

This Court has more recently provided a consistent definition in *Hoai v. Sun Refining & Marketing Co.*, No. Civ. A. 87-2456-LFO, 1991 WL 530756 (D.D.C. May 2, 1991):

> Special or consequential damages are available for losses that result from "special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Restatement (Second) § 351(2)(b). They are really a special category of contractual damages. General damages are those damages which flow naturally from a breach so that a reasonable person would foresee them without any special knowledge of the plaintiff's circumstances. Special damages are unusual damages that a reasonable person would not see without such knowledge.

*See also Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1057 n.19 (D.C. 1980).

The District of Columbia Court of Appeals applied the *Hadley* rule in *Sears, Roebuck & Co. v. Goudie*, 290 A.2d 826 (1972). Ms. Goudie owned a building, part of which she used as her personal residence and another part of which was used by her corporation as a coffeehouse. Ms. Goudie individually contracted with the plaintiffs to provide and install HVAC equipment in her building. The plaintiffs sued Ms. Goudie for nonpayment, and Ms. Goudie filed counterclaims for lost business income she personally suffered related to her corporation's coffeehouse.[2]  290 A.2d at 829, 833 n.9.

The Court of Appeals recognized that the *Goudie* plaintiffs knew Goudie operated a coffeehouse out of the building, and they "should have reasonably contemplated that a breach of contract in providing adequate air conditioning would result in loss of business income or profits in the operation of the coffeehouse." *Id.* at 833-34. Based on this analysis, the court concluded that "liability would extend to all such consequences, 'whether they are actually foreseen or not …'" *Id.* (quoting *A.P. Woodson Co. v. Sakran*, 129 A.2d 175, 177 (1957) (discussing consequential damages for failure to deliver oil on a specified date when the breaching party

---

[2] Although the *Goudie* plaintiffs raised a "real party in interest" argument, Ms. Goudie signed the underlying contracts individually and claimed only damages that she personally suffered. *Id.* at 832. This case was therefore distinguishable from *Lans*, supra.

knew "*of the special circumstance* that a weather condition below the freezing point prevailed

that day and was forecast to continue for several days." (emphasis added))).

To the extent liability for contract damages is premised on knowledge of special

circumstances, those damages are classified as consequential damages.


**H.      The Economic Loss Rule**

The District of Columbia Court of Appeals recently adopted the economic loss rule in

*Aguilar v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 983 (D.C. 2014).  "[U]nder the

economic loss rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of

another cannot recover those losses in tort."  *Id.* at 982.  Stated differently, economic losses are

recoverable for the negligent breach of a duty owed by contract—but not for the negligent breach

of a common law tort duty.

The economic loss rule arose from a concern that products liability concepts could

ultimately allow tort law to supplant contract law.  *E.g. East River S.S. Corp v. Transamerica

Delaval, Inc.*, 476 U.S. 858, 866, 106 S. Ct. 2295, 2300 (1986) ("It is clear, however, that if this

development [of products liability] were allowed to progress too far, contract law would drown

in a sea of tort.").  As previously recognized by the Court, the economic loss rule prevents a

plaintiff in a products liability suit from recovering the "loss of value or use of the product itself,

cost to repair or replace the product, or the lost profits resulting from the loss or use of the

product."  *Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*, 868 F. Supp. 346, 354 (D.D.C.

1994) (citation omitted).

Application of the economic loss rule is not, however, limited to products liability

actions.  *See Aguilar*, 98 A.3d at 985 ("Moreover, there was no mutually agreed upon

relationship between the parties in this case ….  It would be an extraordinary step for us to conclude that a commercial landowner is in a special relationship with each of its tenants' employees …").  And although this rule was formally adopted in the District of Columbia only recently, its logic is consistent with prior analysis of damages by the Court of Appeals.  For example, the Court of Appeals recognized in 1992 that:

> In cases involving negligent performance of a contract, liability to third parties who suffer only economic loss as a result depends on whether or not the defendant owed a duty of reasonable care to the plaintiff. ...  *If no duty was owing, the lack of contractual privity normally bars recovery*.

*Aronoff v. Lenkin Co.*, 618 A.2d 669, 685 (1992) (citations omitted) (emphasis added).

Prior to the 2014 *Aguilar* opinion, analysis of whether such a common law duty of reasonable care was owed in the District of Columbia included consideration of whether harm to a third party was a foreseeable consequence of the breach of contract.  *See Jefferson v. Collins*, 905 F. Supp. 2d 269, 291-92 (D.D.C. 2012).  But in adopting the economic loss rule, the District of Columbia endorsed further policy considerations such as that "[l]egal liability does not always extend to all of the foreseeable consequences of an accident" and that "[w]here purely economic loss is at issue[,] not connected with any injury to one's body or property, … the reach of legal liability is quite limited."  *Aguilar*, 98 A.3d at 983.

Many other jurisdictions provide persuasive analysis about why disappointed expectations in a completed building are "economic losses" for which recovery is barred by the economic loss rule absent privity of contract.  For example, the Supreme Court of Virginia concluded in *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425, 374 S.E.2d 55, 58 (1988), that:

> The plaintiffs here allege nothing more than disappointed economic expectations. They contracted with a builder for the purchase of a package.  The package included land, design services, and construction of a dwelling.  The package also included a

20

> foundation for the dwelling, a pool, and a pool enclosure. The package is alleged to have been defective—one or more of its component parts was sufficiently substandard as to cause damage to the other parts. The effect of the failure of the substandard parts to meet the bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.

*See also Pulte Home Corp. v. Parex, Inc.*, 174 Md. App. 681, 739 (Md. Ct. Spec. App. 2007) ("Pulte presents no convincing argument that would persuade this Court that the trial court erred when it apparently determined that the Barrier EIFS was part of an 'integrated whole'—a completed home—when the damage occurred, and the damage was, thus, a 'harm to the product itself.'" (citations omitted)).

Taken together, this analysis shows that the end-user of a building in the District of Columbia—who lacks contractual privity with the architect who designed the building—cannot recover repair costs from the architect for alleged errors or omissions in the architect's professional services. Recovery of such economic loss is not supported by any common law duty owed to the third party; it is governed instead by the architect's contract under which the design of the building was provided. Such a claim for repair costs would belong instead to the project owner, who contracted with the architect for the building's design.

## IV.    Argument[3]

### A.    WTEF Lacks Standing to Assert the Claims in this Lawsuit

####    i.    *WTEF and WTEF East Are Separate Entities*

---

[3] CNOBG has contemporaneously filed a Statement of Undisputed Material Facts with supporting exhibits. The argument below summarizes CNOBG's Statement of Undisputed Facts, and any citations within this argument to specific exhibits will be to the same exhibits supporting CNOBG's Statement of Undisputed Material Facts.

As set forth in CNOBG's Statement of Undisputed Material Facts, WTEF is a District of Columbia non-profit corporation formed on or about July 7, 1955.  WTEF East is a Delaware corporation formed on or about December 12, 2011.  WTEF East owns the Facility and leases it to WTEF for $100,000 annual rent.  WTEF East maintains separate books and records from WTEF.  WTEF East's board of directors has only 4 members, whereas WTEF's board has approximately 46-48 members.  One of the members of WTEF's board, David Roodberg, agreed that WTEF East is a separate corporation.  Both entities have separate presidents: Eleni Rossides ("Rossides") is the President of WTEF, whereas Richard Aguglia ("Aguglia") is the President of WTEF East.

WTEF East was established to fund construction of the Facility and take advantage of New Market Tax Credits because WTEF could not loan money to itself.  The entity relationships underlying the financing of the Facility's construction are outlined in Exhibit M.  Notably, money flowed from WTEF through two Capital One subsidiaries before reaching WTEF East.

WTEF East itself entered into contracts with both the contractor who built the Facility, Hitt Contracting, Inc. ("Hitt"), and a construction consultant, Advisors, LLC.  The building permit for the Facility was issued to WTEF East—not to WTEF.  Ex. Z, Building Permit.

In responses to requests for admission, WTEF denied that it is a "separate and distinct" entity from WTEF East.  Ex. L, Pl.'s Resp. RFA 2.  In a brief filed with this Court, WTEF argued that WTEF East exists only "on paper" and that it has no employees.  Pl.'s Resp. 2 (ECF No. 36).  There is no factual or legal basis for WTEF's opinion that it is not a legally distinguishable entity from WTEF East.

When previously considering a challenge to standing in another case, this Court recognized that "[a]s a general rule, two separate corporations are regarded as distinct legal

entities even if the stock of one is owned wholly or partly by the other." *Securities Industry and Financial Markets Association v. U.S. Commodity Futures Trading Commission*, 67 F. Supp. 3d 373, 406 (D.D.C. 2014) (citations omitted).  This Court recognized that by choosing to adopt the corporate form, an entity must accept not only the benefits, but also the legal burdens, associated with maintaining the distinction between separate entities.  *Id.*

WTEF is not permitted to now treat WTEF East as its alter ego simply because WTEF East has no employees or has few corporate activities.  WTEF and WTEF East are two entities which were formed in different jurisdictions, which maintain separate books and records, which have different officers and boards of directors, and which separately entered into contracts.  In light of that background, WTEF and WTEF East must consistently be recognized as separate legal entities in this litigation.

ii.   *WTEF Assigned All of Its Right, Title and Interest in the Architect Agreement to WTEF East*

The record is clear that WTEF assigned all of its "right, title and interest" in the Architect Agreement to WTEF East before filing this action.  The scope of this assignment is stated unambiguously in Paragraph 1 of WTEF's own "Assignment and Assumption Agreement," which had an effective date of December 30, 2011 ("Assignment Agreement"):

> Effective as of the date hereof, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in the Architect Agreement; and Assignee hereby accepts the assignment and assumes and agrees to satisfy, perform and discharge, as the same become due, all of the obligations of Assignor under the Architect Agreement; provided, however, Assignor and Assignee shall be and remain jointly and severally liable for all payments that are due or will become due to the Architect in accordance with the Architect Agreement and agree that the Architect is a third party beneficiary of this Agreement.

Ex. O, Assignment Agreement.  The "Assignor" was WTEF, the "Assignee" was WTEF East, the "Architect" was CNOBG, and the "Architect Agreement" was the same AIA Document B101-2007 contract at issue in this litigation.  The individuals executing this Assignment Agreement on behalf of WTEF and WTEF East had authority to do so: the signatures were of the chair of WTEF's board and WTEF East's President.

In addition to the plain language of the Assignment Agreement, WTEF's own actions ratified the assignment.  CNOBG's consent was required by § 10.3 of the Architect Agreement, which stated: "Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other …"  Ex. N, Architect Agreement.  WTEF's intent was expressed clearly in a letter sent by WTEF's President, Rossides, to CNOBG on February 13, 2012, ("Rossides Letter") requesting that CNOBG consent to the assignment.  The Rossides Letter stated as follows:

> In order to obtain financing for this project, the Owner's lender, Capital One ("Lender"), stipulated that the Owner transfer its leasehold interests to a new entity which is known as Washington Tennis & Education Facility East Inc. ("WTEF East Inc."). …
>
> Moving forward, all documents including, but not limited to amendments, change orders and so forth, must be submitted to the Lender for approval.  *So that our team is not using an entity name which is no longer applicable to this project and otherwise creating confusion with the Lender, the Owner would like to formalize an assignment of its interests under the Agreement to Washington Tennis & Education Foundation East Inc.* …
>
> *The purpose of this letter, therefore, is to request the Architect's acknowledge its consent to the Owner's assignment of its interest in the Agreement to Washington Tennis & Education Foundation East Inc.* by signing where indicated at the bottom of this letter and returning an executed original document to me. …

Ex. P, Rossides Letter (emphasis added).

The Rossides Letter was sent to CNOBG as an attachment to an e-mail from WTEF on February 13, 2012.  The body of this e-mail stated: "I am attaching a letter that details how

WTEF East Inc is the entity created to fund and manage the new site.  Thus, we will need to

adjust the amendment to the AIA with similar information."  Ex. Q, Graziano E-mail.

CNOBG asked on February 29, 2012, whether it should begin referring to WTEF East

rather than WTEF on future project documentation, and Aguglia responded: "yes all docs should

be in the name of WTEF East for all construction/architectural purposes …"  Ex. R, E-mail from

Richard Aguglia (Mar. 6, 2012).

The Architect Agreement was in fact amended four times during 2012.  Unlike the

original Architect Agreement, each amendment identified "Washington Tennis & Education

Foundation East, Inc." as the "Owner" of the project.  Ex. S, Amendments.  CNOBG also sent 10

invoices to WTEF East after the assignment.  Ex. T, Invoices.

WTEF conceded in its Rule 30(b)(6) deposition that whatever was assigned by the

Assignment Agreement remains assigned today, and a board member on WTEF's design

committee similarly testified that he was unaware of any changes to the Assignment Agreement.

When asked "what was Washington Tennis and Education Foundation assigning as the

assignor," Joyce Grand, WTEF's Rule 30(b)(6) designee on this topic, responded:

Oh, I can't speak to that.  That – this is legal language.  I'm not a lawyer.

Ex. G, Grand Dep. 62:12-62:15, Nov. 15, 2016.  Joyce Grand's deposition testimony on behalf

of WTEF is even more striking because a month earlier, on October 11, 2016, she verified

WTEF's bold denial that "WTEF assigned to WTEF East all of WTEF's right, title and interest

in the Agreement."  Ex. L, Pl.'s Resp. to RFA 6.

At no time during discovery did WTEF ever disclose any factual basis for its denial of

this assignment.  By contrast, it was only through CNOBG's dogged persistence on this issue

that CNOBG ultimately obtained an executed copy of the Assignment Agreement from a third

party.  At this stage in litigation, WTEF's professed inability to interpret its own Assignment

Agreement is insufficient to support WTEF's legal position.  WTEF effectively assigned all of

its "right, title and interest" to WTEF East before filing this lawsuit.


iii.     *WTEF Lacks Standing to Assert Any of Its Claims Against CNOBG*

Standing is an essential element of WTEF's claims, and WTEF bears the burden of proof

on this issue.  *Lujan*, 504 U.S. at 561.  CNOBG met its burden under Rule 56 to raise this issue

by affirmatively advancing evidence that precludes WTEF's standing in this litigation.  The

Court begins with the presumption that it lacks subject matter jurisdiction over this matter, and

WTEF cannot establish this foundational element of its lawsuit.  *See Kokkonen v. Guardian Life

Insurance Co. of America*, 511 U.S. 375, 377, 114 S. Ct. 1673, 1675 (1994).

Because WTEF voluntarily and explicitly assigned away *all* of its right, title and interest

in the Architect Agreement upon which this litigation is founded, WTEF lacks Article III

standing.  WTEF suffered no "injury in fact" attributable to CNOBG's professional services

because CNOBG's duties and performance were governed by the Architect Agreement, which

WTEF voluntarily assigned to its affiliate.  In light of that assignment, WTEF's disappointed

expectations with the Facility are now governed solely by WTEF's lease with WTEF East, who

owns the Facility and became the "Owner" under the Architect Agreement after the assignment.

WTEF retained no residual, common law interest in CNOBG's contracted services to

support any claim against CNOBG.  After the assignment, WTEF East stood between CNOBG's

services and WTEF's use of the Facility as WTEF East's tenant.  To the extent WTEF, rather

than WTEF East, paid repair or other expenses for the Facility, those expenses are not fairly

traceable to CNOBG's services.  Regardless of whether WTEF's claims are asserted as a breach of contract or as a tort, WTEF lacks Article III standing to pursue these claims against CNOBG.

In addition to WTEF's lack of Article III standing, WTEF also lacks prudential standing to assert its claims against CNOBG.  WTEF voluntarily assigned *all* of its "right, title and interest" in the Architect Agreement to WTEF East as part of its financing strategy for the Facility.  At most, WTEF is a simple guarantor of WTEF East's payment obligation under the Architect Agreement.  *See* Ex. O, Assignment Agreement ("Assignor and Assignee shall be and remain jointly and severally liable for all payments that are due or will become due to the Architect in accordance with the Architect Agreement and agree that the Architect is a third party beneficiary of this Agreement").  WTEF is neither a party to nor an intended beneficiary of the Architect Agreement.

Prudential standing considerations preclude WTEF from pursing a breach of contract claim *after* WTEF explicitly assigned away all of its right, title and interest in the contract to its affiliated entity.  *See Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 717 F. 3d 189, 194 (D.C. Cir. 2013).  Neither WTEF East's lack of employees nor WTEF's failure to follow corporate formalities are viable arguments for allowing WTEF to assert claims held by its affiliated entity, WTEF East.  *See Securities Industry and Financial Markets Association*, 67 F. Supp. 3d 373, 407 (D.D.C. 2014)

WTEF lacks both constitutional and prudential standing to pursue the claims asserted in its Complaint.  WTEF's lack of standing deprives this Court of subject matter jurisdiction, and WTEF's claims should be dismissed with prejudice.

**B.    There Is No Basis for Granting WTEF Leave to Amend Its Complaint to Cure Its Lack of Standing**

The procedural history of this litigation is strikingly similar to that of *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 120 (D.D.C. 1999).  Like the plaintiff in *Lans*, WTEF asserted claims based on an interest that it had assigned to an affiliated entity years ago.  *See Lans* 84 F. Supp. 2d, at 113-14.  Like the plaintiff in *Lans*, WTEF failed to produce a copy of its own executed Assignment Agreement, refused to acknowledge the existence of the executed Assignment Agreement before CNOBG obtained a copy, and repeatedly obfuscated this entire assignment issue during discovery.  *Id.*

The omission of WTEF East from this litigation was not the result of any "honest and understandable mistake."  *See Lans* 84 F. Supp. 2d, at 120.  On July 14, 2014, Richard Aguglia, the President of WTEF East and a "legal advisor" to WTEF, sent a mediation demand to CNOBG ("Mediation Demand") stating:

> pursuant to Section 8.2 of our agreement, a copy of which is attached, *WTEF East, Inc. hereby requests mediation* of the items in dispute described below.

Ex. V, Mediation Demand (emphasis added).  The issues identified by WTEF East in its Mediation Demand mirror those alleged by WTEF in Paragraph 9 of the Complaint.  They include: issues with the Facility's downspouts; failure to specify a building management system ("BMS"); a misaligned storefront; issues with the exterior wall design; failure to specify light guards on overhead lights above the tennis courts; and issues including an added column, pilaster adjustment, and storm pipe from court drains.  Ex. V, Mediation Demand.  The Mediation Demand also repeatedly and explicitly identified duties allegedly owed by CNOBG to WTEF East and costs incurred specifically by WTEF East.

Before WTEF filed its Complaint, copies of this Mediation Demand were provided to (i)

WTEF's attorney, Peter Work ("Work"); (ii) WTEF's President, Rossides; and (iii) WTEF's Chief Operating Officer, Joyce Grand ("Grand").  Ex. L, Pl.'s Resp. to RFA 24, 26, 33.

Work is the attorney who filed WTEF's Complaint, so there can be no argument that WTEF lacked an opportunity for legal counsel about which entity was the correct party in interest.  Strikingly, WTEF made the parallel decision to name as defendants both "Clark Nexsen, Inc." and "Clark Nexsen Owen Barbieri and Gibson, PC," which was CNOBG's name before 2014.  WTEF could just as easily have named both itself and WTEF East as plaintiffs in the initial filing if it had wanted to do so.  Paragraph 3 of the Complaint even identified "WTEF East" as WTEF's affiliated entity, through which WTEF allegedly pursues its "mission to improve the life prospects of low income, underserved children and youth in the District of Columbia …"  The drafter of WTEF's Complaint was clearly aware of the WTEF East entity, but WTEF still chose to assert the claims solely on its own behalf.

WTEF's President, Rossides, is the individual who verified WTEF's Complaint. Rossides testified that she did nothing beyond speaking with counsel to determine which entity was the correct plaintiff to pursue this action.  Rossides is the same individual who previously explained the purpose of the assignment to CNOBG and requested CNOBG's consent to the assignment.  *See* Ex. P, Rossides Letter ("So that our team is not utilizing an entity name which is no longer applicable to this project and otherwise creating confusion with the Lender, the Owner would like to formalize an assignment of its interests under the Agreement to Washington Tennis & Education Foundation East Inc.").

Joyce Grand verified WTEF's answers to CNOBG's First Interrogatories, which made absolutely no reference to WTEF East when describing the claims and damages suffered by WTEF.  But Grand later testified that WTEF East did actually pay some of the utility bills

supporting WTEF's measure of damages.  To date, WTEF still has not amended either its answers to interrogatories or its Rule 26(a) initial disclosures to reference WTEF East.

WTEF's decision to pursue this action in solely its own name, without adding WTEF East as a co-plaintiff, was intentional.  WTEF clearly recognized the importance of naming real parties in interest to the litigation because WTEF chose to sue CNOBG under both its prior name (Clark Nexsen Owen Barbieri and Gibson, PC) and its current name (Clark Nexsen, Inc.).

If there was any confusion about WTEF's intent, it has been clarified through the parties' discovery dispute concerning the good faith of WTEF's responses to requests for admission. CNOBG filed a brief in support of its discovery motion on November 14, 2016, expressly stating that it intended to file a motion for summary judgment based on this Court's analysis of standing in *Lans v. Gateway* 2000.  (ECF No. 34, at 1-2); *see also* CNOBG's Reply in Supp. at 1-2 (ECF No. 37).  WTEF responded by persisting in its denials that WTEF and WTEF East were separate and distinct entities and that WTEF assigned its interest in the Architect Agreement to WTEF East.  *See* Pl.'s Resp. at 2, 6-8 (ECF No. 36).  The record shows that WTEF considered these issues both before and after filing its Complaint, but WTEF simply reached the wrong legal conclusion about the significance of the Assignment Agreement.  *See* Pl.'s Resp. (ECF No. 36) ("Clark Nexsen apparently believes it is entitled to dismissal of this lawsuit because it was filed in the name of WTEF, rather than on behalf of WTEF East.").

Because WTEF lacked standing at the time it filed its lawsuit and continues to lack standing, the Court is deprived of subject matter jurisdiction.  Without subject matter jurisdiction, this Court cannot permit amendment of the Complaint under Rule 15 to retroactively create jurisdiction.  *See Lans*, 84 F. Supp. 2d, at 115-17.  A "plaintiff may not amend the

complaint to substitute a new plaintiff in order to cure a lack of jurisdiction, because a plaintiff may not create jurisdiction by amendment when none exists." *Id.* at 115.

Rule 17 likewise provides no relief for WTEF's lack of standing. This Court has previously adopted the "honest and understandable mistake" test to evaluate an assignor's request to substitute the assignee as the real party in interest under Rule 17(a). *Lans*, 84 F. Supp. 2d, at 120. But as set forth above, WTEF's failure to name WTEF East as a co-plaintiff was not the result of any honest and understandable mistake. Permitting WTEF to now add WTEF East as an additional or substitute party under Rule 17 would improperly reward WTEF for its own failures, oversights and misrepresentations. *Id.* As in *Lans*, nothing in the record suggests that WTEF ever questioned the effect or validity of the assignment of its interest to WTEF East *before* the issue was raised by defense counsel in this litigation. Like the plaintiff in *Lans*, WTEF advanced untenable positions in support of its standing: (1) that WTEF East is the alter ego of WTEF rather than a legally distinguishable entity; and (2) that the assignment never occurred. Ex. L, Pl.'s Resp. RFA 2 & 6; *see Lans*, 84 F. Supp. 2d, at 122.

Even if WTEF had made an honest and understandable mistake when drafting its Complaint, the plain language of Rule 17(a)(3) contemplates only a "reasonable time" after objection for the real party in interest to "ratify, join, or be substituted into the action." Defense counsel first raised this standing issue informally with WTEF's prior counsel on August 3, 2016. *See* Reply at 3 (ECF No. 37) (providing a copy of the correspondence as Exhibit 2). After continuing to emphasize the importance of this assignment issue with opposing counsel, CNOBG formally and publicly disclosed its standing argument and reliance on *Lans* in its brief filed on November 14, 2016. (ECF No. 34).

Neither WTEF nor WTEF East took any action in the following *five months* to ensure that the action was pursued by a real party in interest.  Instead, and consistent with WTEF's apparent position on this issue, WTEF's counsel repeatedly attempted to refer jointly to WTEF and WTEF East as a single entity during depositions in early 2017.  *See* Ex. B, Winborne Dep. 4:20-5:17, Jan. 24, 2017; Ex. H, Kaye Dep. 6:9-6:22, February 8, 2017.  If this Court agrees with CNOBG that WTEF lacks standing, then Rule 17(a)(3) provides no opportunity for WTEF to now reverse course and amend its Complaint after the close of discovery.

WTEF lacks standing to assert the claims described in the Complaint.  Because WTEF's lack of standing is not the result of any honest and understandable mistake and because this standing argument was expressly and overtly raised in a brief filed by CNOBG five months ago (and acknowledged in WTEF's response to that brief), there is no basis, precedent, or authority for WTEF to now retroactively create subject matter jurisdiction by amending its Complaint after the close of discovery.  *Cf. Lans*, 84 F. Supp. 2d, at 123.

WTEF's claims against CNOBG should be dismissed with prejudice.

## C.      Count II Is Barred by the Economic Loss Rule

Count II alleges the breach of a common law duty owed by CNOBG to WTEF to provide design services "with the professional skill and care ordinarily provided by architects practicing in this locality under the same or similar conditions ..."  This claim for the negligent breach of a common law duty is barred, however, by the economic loss rule.

As argued above, WTEF lacks standing to assert the breach of contract claim alleged in Count I because WTEF assigned all of its interest in the Agreement to WTEF East.  Even if WTEF could establish that a residual common law duty was owed by CNOBG to WTEF, the

Assignment Agreement eliminated WTEF's privity of contract with CNOBG for the purpose of the economic loss rule. WTEF has not alleged *any* damages for personal injury, nor did WTEF allege any damages for injury to property that is distinguishable from the building itself. WTEF's Complaint instead seeks to recover damages associated only with its disappointed expectation in the completed Facility and related costs, all of which are properly recognized as economic losses. The economic loss rule precludes recovery of these economic losses under a claim for the negligent breach of a common law duty—particularly here, where WTEF intentionally assigned all of its right, title and interest in the underlying contract to another entity.

Count II's allegation of the breach of a common law professional duty is insufficient under the economic loss rule for WTEF to recover any costs it incurred (or will incur) to repair the building or that are otherwise attributed to CNOBG's professional services. These costs are unrecoverable by WTEF because CNOBG's professional services were governed by the contract that WTEF itself assigned to WTEF East. WTEF has not alleged any personal injury or property damage—the concern of tort negligence—to overcome its lack of privity with CNOBG.

**D.      WTEF's Claims Are Barred by the Statute of Limitations**

  *i.  WTEF Filed Its Complaint More than Three Years After Its Causes of Action Accrued*

WTEF filed its Complaint on November 10, 2015. To survive the statute of limitations bar, WTEF's causes of action cannot have accrued more than three years before that date. *See* D.C. Code § 12-301. The critical date for analysis of the statute of limitations in this case is therefore November 10, 2012. WTEF's causes of action are barred because they accrued before that date.

The effective date of the Architect Agreement is October 6, 2010.  Ex. N.  The scope of CNOBG's professional services is outlined in Article 3 of the Architect Agreement to include multiple phases of design.  Similar to the contract at issue in *Hansel Phelps Construction Co. v. Cooper Carry, Inc.*, 2016 WL 5415621, at *2 (D.D.C. Sept. 28, 2016), CNOBG was to provide separate: (1) Schematic Design Phase Services, (2) Design Development Phase Services, (3) Construction Documents Phase Services, (4) Bidding or Negotiation Phase Services, and (5) Construction Phase Services.  The Architect Agreement was not a "unitary construction contract," so the first breach during any of those phases of service would trigger the accrual of WTEF's cause of action.  *See Hansel Phelps*, 2016 WL 5415621, at *4,

The Owner, whether that term be defined as WTEF or WTEF East or an agent of one of those entities, approved each phase of CNOBG's design.  The Owner then hired a permit expeditor named Kim Mitchell to walk the paperwork through the building official's office and obtain a building permit.  In October of 2011, CNOBG's construction documents—which were the culmination of all prior phases of design—were submitted by the Owner to the District of Columbia's Department of Consumer and Regulatory Affairs ("DCRA") for a building permit.

Submitting the construction documents to the DCRA marked a transition from the design of the Facility to the construction of the Facility.  On March 1, 2012, the DCRA issued a building permit to WTEF East.  Ex. Z, Building Permit.   By the time this building permit was issued, CNOBG's design was completed.

Construction of the Facility began during March of 2012.  Any alleged errors or omissions in CNOBG's design that existed at that time represented a breach of CNOBG's obligation under the Architect Agreement to provide the Construction Document Phase Services (and possibly also earlier phase services), triggering the accrual of WTEF's cause of action.

34

Notably, it was clear by March 1, 2012, that CNOBG's design of the Facility did *not* include a building management system ("BMS"). *See generally* Compl. ¶ 9(b). The mechanical design described by CNOBG's construction documents and submitted to the DCRA relied instead on individual thermostats, rather than a BMS, to control each variable air volume ("VAV") box. WTEF itself expounded on this issue in response to CNOBG's interrogatories by stating that "the *original design document* issued by Clark Nexsen and/or Metropolitan Engineering was flawed and doomed to failure." Ex. X, Ans. to Interrog. 3 (emphasis added). The claims described in Paragraph 9(b) of the Complaint are barred by the statute of limitations because CNOBG's HVAC design was completed—without a BMS—before November 10, 2012.

Paragraphs 9(e), (h), (i), (j) and (k) of the Complaint similarly allege errors and omissions in CNOBG's "original" design. That "original" design was completed and submitted to the DCRA in October of 2011, which is more than a year before the critical date for the statute of limitations analysis, November 10, 2012. Any claim arising from these allegations are barred by the statute of limitations.

Paragraphs 9(a), (d), (f) and (g) of the Complaint use broader language alleging "design errors," "failure to specify" appropriate materials, and violations of the D.C. Building Code. But the gutters were designed and installed before November 10, 2012. *See* Compl. ¶ 9(a). WTEF does not make any allegation to suggest that the condensate line, which was installed before November 10, 2012, was changed at CNOBG's direction after that date. This alleged violation was present in CNOBG's earlier construction documents. *See* Compl. ¶ 9(d). Purported design errors relating to venting and painting of exterior columns and failure to specify an expansion joint likewise do not relate to any *changes* in the design occurring after November 10, 2012. *See*

Compl. ¶ 9(f) & (g).  All of these issues relate to alleged errors or omissions in a design that was completed and then constructed by the general contractor before November 10, 2012.

CNOBG issued a certificate of substantial completion on November 13, 2012.[4]  By that date, both CNOBG and Hitt believed the Facility was suitable for its intended use as a tennis facility *based on a site visit of the Facility that occurred on November 9, 2012, with Rossides*.

WTEF alleged in the Complaint that CNOBG's certificate of substantial completion should not have been issued because "a number of problems existed, some of which persist to this day."  Compl. ¶ 8.  WTEF further alleged that "[i]n some cases HITT was responsible for the problems; in other cases Clark Nexsen was responsible; and in still other cases HITT and Clark Nexsen shared responsibility."  *Id.*  There is absolutely no evidence that the allegations in the Complaint rely on any new or revised designs issued by Clark Nexsen after the November 9, 2012, site visit, upon which the Certificate of Substantial Completion was based.  Whatever "problems" are referenced by Paragraph 8 of the Complaint must already have existed—either on paper or in Hitt's completed construction—by the November 9, 2012, site visit.  Claims founded on Paragraphs 9(a), (d), (f) and (g) of the Complaint are barred by the statute of limitation.

Consistent with this reasoning, Hitt's project executive, Mike Bellusci, testified that when the Certificate of Substantial Completion was issued, the Facility's gutters and downspouts had already been installed.  Attached to the Certificate of Substantial Completion was Metropolitan Engineering's field report from their November 9, 2012, site visit noting that the Facility's "[d]ownspouts are clogged with leaves."  Ex. AA, Certificate of Substantial Completion.  The

---

[4] Paragraph 8 of the Complaint alleges that it was issued on November 12, but the document was dated November 13, 2012.  Ex. AA, Certificate of Substantial Completion.

condensate line had also already been installed by that date.  A temporary certificate of occupancy was issued by the DCRA in November of 2012 to allow WTEF to occupy the Facility.  WTEF even held a grand opening event at the Facility during that same month.  No reasonable fact-finder could conclude that the alleged design errors and omissions asserted in Paragraphs 9(a), (d), (f) and (g) were introduced by CNOBG after November 10, 2012.

The only remaining allegation in Paragraph 9 is discussed in Subparagraph (c).  This allegation relates to a construction error regarding the alignment of the storefront wall to the surrounding construction.  WTEF claims that CNOBG issued its certificate of substantial completion without first notifying WTEF about this construction error.  But the project Owner (whether defined as WTEF or as WTEF East or an agent of one of those entities) already had actual notice of this storefront wall construction error at least in August of 2012.

Mark Kost was acting as the Owner's agent during the construction of the Facility, and he sent an e-mail about this issue to: (1) WTEF's President, Rossides; (2) WTEF East's President, Aguglia; and (3) a member of WTEF's design committee, Roodberg.  Ex. AC, E-mail from Mark Kost (Aug. 16, 2012).  CNOBG was also copied on Kost's e-mail, which described a proposed "fix" for the issue that would be implemented at Hitt's expense.  Exhibit AD includes a photograph showing the fix, which accommodated the CMU wall being out of alignment with the storefront wall.  *See* Ex. I, Lazaro Dep. 256:1-259:11 (explaining the photograph of the storefront / CMU misalignment).

Kost's August 16, 2012, e-mail specifically advised the Owner that:

> If the Owner has any concerns relating to proceeding with this proposed fix, those concerns should be brought forward now.  The alternative to this is to remove the partially constructed exterior walls and reconstruct the footings, then re-build.  That option will obviously be very time-consuming and we will lose time on the schedule that will not be made up.  My suggestion is to proceed with the proposed fix offered by the Contractor and approved by the Architect and Engineer.

Ex. AC, E-mail from Mark Kost (Aug. 16, 2012).  Further down in that string of e-mails, Hitt took full responsibility for this issue.

WTEF now improperly attempts to hold CNOBG responsible for the cost to relocate the storefront wall more than three years after Hitt offered to re-build the wall in accordance with CNOBG's construction documents at Hitt's own expense.  WTEF had actual notice of this issue more than three years before filing its Complaint against CNOBG, and Mark Kost specifically advised Rossides (WTEF's President), Aguglia (WTEF East's President), and Roodberg (member of WTEF's design committee) that they should raise any concerns they had about the issue at that time.  Any claim relying on the allegations of Paragraph 9(c) is barred by the statute of limitations.

As set forth above, the causes of action alleged in the Complaint accrued more than three years before WTEF filed its Complaint.  WTEF's claims are barred by the statute of limitations.

ii.     *The Discovery Rule Does Not Apply Under These Facts*

WTEF has more in common with the project owner in *Capitol Place I* than with the lay homeowner in *Ehrenhaft.*  There is no reason to apply the discovery rule under the facts of this case.

Notably, WTEF hired various independent advisors on this project, including Gilbane Building Company ("Gilbane"), Advisors, LLC ("Advisors"), and Mark Kost's firm, Capital Construction Consultants, Inc. ("CCCI").   Rossides testified that Advisors reviewed CNOBG's plans, and Gilbane's pre-construction manager, Anthony Albanese ("Albanese"), testified that Gilbane reviewed every drawing iteration.  As described above, Mark Kost advised the Presidents of both WTEF and WTEF East about the storefront issue.  A member of WTEF's own

design committee, Roodberg, who was addressed by Kost's e-mail, also had extensive personal experience in the construction industry.

These facts present a stark contrast to the Court of Appeals's concern in *Ehrenhaft* that a lay homeowner should not be reasonably expected "to engage yet another professional to oversee the work" involved in adding a new room to his house.  *Ehrenhaft*, 483 A.2d at 1202.  Unlike the lay homeowner expanding his home, WTEF is a more sophisticated entity with greater resources, and the Owner (as that contractually defined term applied at various times to either WTEF or WTEF East) did in fact hire additional consultants to assist with overseeing the design and construction of its new commercial building.

As in *Capitol Place I*, there were also abundant signs of the alleged defects in CNOBG's services before November 10, 2012.  Most obvious was the storefront alignment issue, which was expressly brought to WTEF's and WTEF East's attention on August 16, 2012, by Mark Kost's e-mail.  It was also clear to anyone reviewing the construction documents submitted to the DCRA for a building permit that CNOBG's HVAC design did not include a BMS.  Even if WTEF did not fully appreciate all of the issues outlined in its Complaint before November 10, 2012, WTEF did not have the luxury to "defer institution of suit and wait and see whether additional injuries come to light."  *Capitol Place I*, 673 A.2d at 200.

iii.     *Even if the Discovery Rule Was Applied, WTEF's Causes of Action Would Still Be Barred by the Statute of Limitations*

Even if the discovery rule applied to these facts, it still would not save WTEF's causes of action from the statute of limitations.  The discovery rule does not simply delay accrual of a cause of action until whenever a plaintiff subjectively discovers its injury.  The discovery rule

includes an objective component to consider when the plaintiff "in the exercise of reasonable diligence should know" of the alleged injury.  *Ehrenhaft*, 483 A.2d at 1203.

Section A.2.2 of the Architect agreement expressly identified Eleni Rossides as the person "in addition to the Owner's representative, who [is] *required to review* the Architect's submittals to the Owner …"  Ex. N (emphasis added).  Yet Rossides repeatedly testified that she never reviewed the construction documents in any detail and that she simply relied on CNOBG to provide whatever the Owner wanted.  It is certainly possible that neither Rossides nor WTEF recognized the purported design errors and omissions that were reflected by the construction documents until after WTEF occupied the building.  Nevertheless, it was not "reasonably diligent" for WTEF, through Rossides, to rely blindly on CNOBG without attempting to review, understand, and confirm the details of the design CNOBG produced.  *See* Ex. K, Rossides Dep. 45:8-45:21.

There is no basis to delay the accrual of WTEF's causes of action beyond November 10, 2012.  WTEF's claims should be dismissed with prejudice.

**E.      WTEF Waived Recovery of Consequential Damages Against CNOBG**

The Architect Agreement broadly and unambiguously waived WTEF's right to recover consequential damages against CNOBG.  Section 8.1.3 of the Architect Agreement, which was signed by WTEF before the Architect Agreement was assigned to WTEF East, states: "The Architect and Owner waive consequential damages for claims, disputes or other matters arising out of or relating to this Agreement."  Ex. N, Architect Agreement.

As discussed above, the hallmark of consequential damages is the necessary knowledge of special circumstances underlying WTEF's claim of damages.  A clear example of a claim for consequential damages is found in Paragraph 9(b), which alleges:

> Metropolitan Engineering predicted the monthly utility bills that WTEF would incur with the specified system.  Neither Metropolitan Engineering nor Clark Nexsen advised WTEF, however, that Metropolitan Engineering's predicted utility bills could only be achieved with a mechanical building management system ("BMS") which Metropolitan Engineering and Clark Nexsen neither specified nor even gave notice of to WTEF.  As a direct result of Metropolitan Engineering's and Clark Nexsen failures in this regard, WTEF has experienced utility bills on the Project nearly double those which Metropolitan Engineering had predicted.

Paragraph 9(b) of the Complaint is analogous to *Goudie*.  In *Goudie*, the contracting parties knew that Ms. Goudie's corporation would be using the building and benefitting from the air conditioning provided by the plaintiffs.  That special knowledge was the foundation of Ms. Goudie's recovery against the plaintiffs.  Likewise, WTEF believes it can prove that CNOBG had special knowledge during the design phases about WTEF's target monthly operating cost for the building.

The cost of higher-than-expected utility bills is properly recognized as consequential damages, which are analogous to the lost profits discussed in *Goudie*.  These damages relate not to the primary purpose of an HVAC system—to heat and cool the building—but instead to the alleged extra-contractual representation about a predicted value of monthly utility bills that would be incurred to operate the specified HVAC system.  The "predicted monthly utility bills" referenced in Paragraph 9(b) of the Complaint refer, however, to rough analysis performed by Metropolitan Engineering in 2014 in response to the Owner's complaints about actual utility bills—long after both the design and construction of the Facility was completed.  Neither CNOBG nor Metropolitan provided any prediction to WTEF during the design of the Facility

about anticipated utility costs.  WTEF itself provided no instruction to CNOBG about its own

requirements or expectations about monthly operating costs during the design of the Facility.

Notwithstanding these evidentiary hurdles that WTEF must overcome, special knowledge

about WTEF's anticipated monthly operating cost of the Facility is essential for a reasonable

person to connect WTEF's disappointed expectations in the monthly utility bills to a breach of

the Architect Agreement.  Even if WTEF could prove its entire argument, WTEF's higher than

expected utility bills are properly classified as consequential damages.

Unlike *Goudie*, the Architect Agreement waived recovery of consequential damages

against CNOBG.  To the extent WTEF could ever prove that CNOBG or CNOBG's consultant

was aware of WTEF's target monthly operating costs for the Facility (which is extremely

unlikely based on the deposition testimony and lack of any such requirement in the Architect

Agreement), damages founded on utility bills are consequential damages which were waived by

§ 8.1.3 of the Architect Agreement.  WTEF's claims relating to utility bill expenses should be

dismissed with prejudice.


**F.     WTEF Cannot Prove Its Case Without Expert Testimony to Establish a Breach of
         the Applicable Standard of Care**

Under D.C. law, a plaintiff alleging negligence "has the burden of proving … the

applicable standard of care, a deviation from that standard by the defendant, and a causal

relationship between the deviation and the … injury."  *Briggs v. Washington Metropolitan Area

Transit Authority*, 481 F.3d 839, 841 (D.C. Cir. 2007) (citations omitted); *see District of

Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) ("A plaintiff must put on expert

testimony to establish what the standard of care is if the subject in question is so distinctly

related to some science, profession or occupation as to be beyond the ken of the average

layperson."). WTEF has advanced its claims against CNOBG as negligent breaches of both contract duties and common law duties. Under either formulation, expert testimony is required for WTEF to establish a breach of the applicable standard of care.

As set forth in CNOBG's contemporaneous motion in limine, the arguments of which are incorporated here by reference, WTEF hopes to establish this breach of the applicable standard of care through the testimony of its expert architect, Jeffrey M. Stoiber. During deposition questioning, however, it became apparent that Mr. Stoiber's opinions lacked any factual foundation. CNOBG has contemporaneously moved this Court to preclude Mr. Stoiber from offering his speculative standard-of-care opinions at trial.

WTEF also designated its commissioning agent, John Farrell, to provide a mechanical engineering opinion, but Mr. Farrell's report says nothing about any breach of the applicable standard of care. Mr. Farrell later testified, unambiguously, that he was not asked by WTEF to opine on the applicable standard of care. CNOBG has contemporaneously moved this Court to preclude Mr. Farrell from testifying about the applicable standard of care.

Without any expert opinion to offer about a breach of the applicable standard of care, WTEF cannot prevail in this action at trial. This Court should grant summary judgment in favor of CNOBG and dismiss WTEF's claims with prejudice.

## V.     Conclusion

Both of WTEF's claims turn on privity of contract with CNOBG, which WTEF itself eliminated by voluntarily assigning the Architect Agreement to WTEF East before filing its Complaint. WTEF lacks standing to bring this action because it suffered no injury in fact on the breach of contract claim, because the tort claim is not traceable to CNOBG's services, and

because prudential considerations preclude one corporate entity from advancing causes of action held by a different, affiliated entity.  In light of WTEF's obfuscation of this issue throughout discovery and WTEF's failure to address this issue in the *five months* since CNOBG formally and publicly identified WTEF's lack of standing, there is no basis for permitting WTEF to now amend its Complaint and create jurisdiction where none existed.  This Court does not have subject matter jurisdiction over WTEF's claims, and they should be dismissed with prejudice.

In addition to this Court's lack of subject matter jurisdiction over the action, Count II of the Complaint cannot survive under the economic loss rule without privity of contract between WTEF and CNOBG.  Having assigned the Architect Agreement to WTEF East before filing this action, WTEF cannot recover damages for its disappointed expectations in the Facility against CNOBG under a tort theory of negligence.

WTEF failed to assert its claims against CNOBG within the applicable three-year statute of limitations.  All of WTEF's claims against CNOBG are time barred, and they should be dismissed with prejudice.

If WTEF could overcome these broader bars against its claims, WTEF still cannot recover consequential damages, which it waived in the Architect Agreement.  All damages relating to WTEF's disappointed expectations in the monthly costs of utility bills turn on a question of whether CNOBG had knowledge of WTEF's anticipated operating costs for the Facility.  Such essential knowledge classifies these damages as consequential damages, which were explicitly waived by WTEF in the Architect Agreement.

Even if the Court allowed this case to go to trial, WTEF would have no admissible expert testimony available to describe any breach by CNOBG of the applicable standard of care.

Without such essential expert opinions to support its case, WTEF cannot prevail on either of its

claims against CNOBG.

For the foregoing reasons, this Court should grant CNOBG's Motion for Summary

Judgment and dismiss WTEF's Complaint with prejudice.

Respectfully submitted,

CLARK NEXSEN OWEN BARBIERI
AND GIBSON, P.C. d.b.a. Clark Nexsen, PC; and

CLARK NEXSEN, INC.

By:_____/s/ James W. Walker_____
Counsel

James W. Walker (DC Bar 495552)
Stephan F. Andrews (DC Bar 497228)
J. Brandon Sieg (admitted *pro hac vice*)
VANDEVENTER BLACK LLP
901 E. Byrd Street, Suite 1600
Richmond, VA 23219
Phone: (804) 237-8800
Fax: (804) 237-8801
jwalker@vanblacklaw.com
sandrews@vanblacklaw.com
bsieg@vanblacklaw.com
*Counsel for Defendants / Counter-Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April, 2016, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following counsel of record:

Patrick O. Daugherty
Jonathan D. Simon
Herman Gessner
Van Ness Feldman LLP
1050 Thomas Jefferson St., NW
Washington, D.C. 20007
Phone: (202) 298-1800
Fax: (202) 338-2416
pod@vnf.com
jxs@vnf.com
hgesser@vnf.com
*Counsel for Plaintiff / Counter-Defendant*


                        /s/ James W. Walker


4832-3618-3862, v.  7