# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————— )
WASHINGTON TENNIS & EDUCATION )
FOUNDATION, INC., )
     )
    **Plaintiff,** )
     )
    **v.** )    **Case No. 15-cv-02254 (APM)**
     )
**CLARK NEXSEN, INC., et al.,** )
     )
    **Defendants.** )
—————————————————————————— )

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

Dissatisfied with Defendant Clark Nexsen, Inc.'s ("Clark Nexsen" or "Defendant") services related to the construction of a $10 million tennis and education facility in Southeast Washington, D.C., Plaintiff Washington Tennis & Education Foundation, Inc. ("WTEF" or "Plaintiff") brought this lawsuit against Clark Nexsen, asserting two claims: (1) breach of the parties' contract, known as the "Architect Agreement," and (2) breach of Clark Nexsen's common law duty of professional care. WTEF also sought to add as co-plaintiff Washington Tennis & Education Foundation East, Inc. ("WTEF East"), a related but separate entity to whom Plaintiff assigned "all of [its] right, title and interest" in the Architect Agreement in order to obtain certain federal tax credits. In response to Plaintiff's two-count Complaint, Defendant counterclaimed for breach of contract.

This court initially granted Clark Nexsen's Motion for Summary Judgment and denied WTEF's Motion to Add WTEF East as a co-plaintiff. The court concluded that, by virtue of WTEF's assignment of "all of [its] right, title, and interest" in the Architect Agreement to WTEF

East, WTEF lacked standing to sue Defendant for claims arising from the Agreement. The court therefore dismissed Plaintiff's claims against Defendant and rejected WTEF's bid to add WTEF East to the suit to cure the standing defect of its original claims. The matter proceeded solely on Defendant's counterclaim for breach of contract.

Plaintiff now moves for reconsideration of the dismissal of its claims or, in the alternative, for certification of an interlocutory appeal. WTEF asserts that the court incorrectly concluded that it assigned its breach of contract and professional negligence claims to WTEF East and further erred by prohibiting WTEF East from joining the suit. Upon reconsideration, the court finds no error in its conclusion that WTEF lacks standing to bring a breach of contract claim against Defendant by virtue of assigning its rights and interests in the Architect Agreement to WTEF East. The court likewise upholds its ruling dismissing Plaintiff's tort claim, but does so on a different ground: the professional malpractice claim, whether advanced by WTEF or WTEF East, is barred by the statute of limitations. In view of that ruling, the court affirms its decision to disallow WTEF East from joining this action because adding WTEF East would be futile. The court also rejects WTEF's request to certify this matter for interlocutory review.

Accordingly, the court denies Plaintiff's Motion for Reconsideration, or in the Alternative, for Certification of an Interlocutory Appeal.

## II.     BACKGROUND

The court incorporates the relevant facts laid out in its Memorandum Opinion and Order, dated September 13, 2017, and recites here only the information necessary to resolve the Motion for Reconsideration. *See generally* Mem. Op. & Order, ECF No. 58 [hereinafter Sept. 13 Order].

## A. Factual Background

In brief, Plaintiff WTEF, a nonprofit organization, and Defendant Clark Nexsen, an architecture and engineering firm,[1] entered into what the parties refer to as the "Architect Agreement" on October 6, 2010. Pursuant to that contract, Clark Nexsen agreed to provide architectural design and construction oversight services for Plaintiff's new indoor tennis facility, known as the East Capitol Campus. *See* Def.'s Mot. for Summ. J., ECF No. 46 [hereinafter Def.'s Summ. J. Mot.], Ex. N, ECF No. 47 [hereinafter Architect Agreement]. The Architect Agreement outlined the scope of Clark Nexsen's design responsibilities, setting out the following sequential phases of design: the Schematic Design Phase, the Design Development Phase, and the Construction Document Phase. *See* Architect Agreement, Art. 3, §§ 3.2–3.4. According to the Agreement, each new phase of design began "based on Owner's [i.e., WTEF's] approval" of the prior phase of design. *Id.* §§ 3.2.5, 3.3.1, 3.4.1. The Agreement further set forth the scope of Clark Nexsen's bidding phase and construction phase responsibilities. *Id.* §§ 3.5–3.6.

In December 2011, Plaintiff formed a new nonprofit entity, WTEF East, as a wholly-controlled subsidiary of WTEF. Sept. 13 Order at 3. The express purpose of WTEF East's formation was to take advantage of certain tax credits to finance the East Capitol Campus project. *Id.* WTEF transferred all property rights in the East Capitol Campus to WTEF East to secure the tax benefits. *Id.* at 3–4. This restructuring also caused WTEF, with the consent of Clark Nexsen, to assign "all of [its] right, title, and interest" in the Architect Agreement to WTEF East. *See* Def.'s Summ. J. Mot., Ex. O, ECF No. 46-18 [hereinafter Assignment Agreement]. The assignment became effective on December 30, 2011, *see id.*, as did the Sublease Agreement by which WTEF

---

[1] As before, the court refers to one defendant, Clark Nexsen, throughout the opinion. Sept. 13 Order at 2 n.1.

East subleased the East Capitol Campus facility to WTEF, *see* Def.'s Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 52 [hereinafter Def.'s Summ. J. Reply], Ex. AG, ECF No. 52-2, at 18 (Sublease Agreement).

On March 1, 2012, the D.C. Department of Consumer and Regulatory Affairs ("DCRA") issued a building permit to WTEF East, and construction of the East Capitol Campus began shortly thereafter. *See* Def.'s Summ. J. Mot. at 34; *id.*, Ex. Z, ECF No. 46-29. Clark Nexsen then issued a Certificate of Substantial Completion on November 13, 2012, certifying that the work performed under the Architect Agreement was sufficiently complete so as to allow occupancy or use of the facility. *See* Def.'s Summ. J. Mot., Ex. AA, ECF No. 46-30. WTEF began conducting its programming in the East Capitol Campus facility in January 2013.

Dealings between the parties went awry not long after, caused by a host of perceived design and construction defects. By letter dated July 14, 2014, Richard L. Aguglia, President of WTEF East, submitted a request for mediation to Clark Nexsen pursuant to section 8.2 of the Architect Agreement. *See* Def.'s Summ. J. Mot., Ex. V, ECF No. 46-25 [hereinafter Mediation Demand]. When mediation proved unsuccessful, WTEF, and WTEF alone, filed this action on November 10, 2015. *See* Notice of Removal, ECF No. 1, Compl., ECF No. 1-3, ¶ 9.

### B. Procedural History

Plaintiff advances two theories of liability in its Complaint. In Count I, WTEF alleges that Defendant breached the Architect Agreement through errors and defects in its design of the East Capitol Campus and its oversight of the construction process. *Id.* ¶¶ 11–13. In Count II, WTEF alleges that Defendant committed professional malpractice by failing to perform its work with the skill and care ordinarily provided by architects in this locality and by violating industry standards. *Id.* ¶¶ 14–17. In its Complaint, WTEF identifies eleven "problems" with the East Capitol Campus

facility "for which Clark Nexsen bears sole responsibility, or shares responsibility with [the general contractor, HITT]," *id.* ¶ 9, and for which "WTEF calculates the cost of remediating" to be in excess of $750,000, *id.* ¶ 10.

In summary, as alleged by Plaintiff, the defects are as follows:

(a) <u>Gutters and Downspouts</u>: The roof drainage on the East Capitol Campus is inadequate due to Clark Nexsen's design errors. The gutters regularly overflow when it rains, causing water to flood into the facility, and one of the downspouts is not tied into the underground storm drainage system. The gutters and downspouts show extraordinarily rapid deterioration.

(b) <u>HVAC System</u>: Clark Nexsen's subcontractor designed the HVAC system for the East Capitol Campus and predicted the monthly utility bills WTEF would incur. Neither the subcontractor nor Clark Nexsen, however, advised WTEF that the predicted utility costs could be achieved only with a mechanical building management system. WTEF has incurred utility bills that exceed those predicted as a result. Major components of the HVAC system are failing and show extraordinarily rapid deterioration.

(c) <u>Improper Storefront Location</u>: The "storefront wall" near the front end of the facility was not built according to the Clark Nexsen-issued design documents, and does not align with the exterior wall of the facility. Adrian Lazaro, a Clark Nexsen architect, learned of the improper location of the storefront wall and yet issued a Certificate of Substantial Completion without giving notice to WTEF.

(d) <u>Condensate Line</u>: The condensate line exiting from the facility's mechanical room drains onto an exterior sidewalk, creating a slip-and-fall hazard.

(e) <u>Exterior Wall Detail</u>: The Clark Nexsen-issued design documents erroneously specified the type of block to be used in the exterior walls of the facility, necessitating the issuance of a change order.

(f) <u>Exterior Columns</u>: Despite repeated painting, WTEF has experienced recurring improper venting and peeling paint at the

base of the exterior columns at the front of the facility, indicating a design error by Clark Nexsen.

(g) <u>Buckling Interior Floors</u>: The vinyl tile flooring buckles in a straight line across the hallway near Room 128 due to Clark Nexsen's failure to specify expansion joints in the floor to match expansion joints in the underlying slab.

(h) <u>Indoor Tennis Court Light Fixture Guards</u>: Clark Nexsen's original design for indoor tennis court light fixtures called for exposed light bulbs. Plaintiff incurred $8,000 in costs to install guards to ensure the safety of players below.

(i) <u>Pilaster Adjustments</u>: Clark Nexsen's original design for the pilaster had incorrect dimensions, requiring additional steel reinforcement at a cost of $2,295.

(j) <u>Added Column Footing</u>: Clark Nexsen's original design for the support columns was deficient, leading to a cost of $1,400 for additional structural support.

(k) <u>Storm Pipe from Tennis Court Drains</u>: Clark Nexsen's original design erroneously called for the tennis court drains to be piped into the front bioretention drain. The drains instead should have been connected to the sewer. The cost of reconnecting the drain to the proper outlet was $4,900.

*See* Compl. ¶ 9. Defendant responded by denying responsibility for any of these claimed flaws. Receipt of Original Case File, ECF No. 5, Super. Ct. Docs., ECF No. 5-1, at 7–46, ¶¶ 9–10. Defendant also counterclaimed for breach of contract, seeking payment for unpaid invoices and interest in the amount of $47,514.71, plus additional interest accrued since the counterclaim's filing. *Id.* at 11–14.

By Memorandum Opinion and Order dated September 13, 2017 ("Order"), the court granted summary judgment in favor of Defendant on the ground that WTEF lacked standing to assert its breach of contract and malpractice claims, because it had assigned "all of [its] right, title, and interest" in the Architect Agreement to its subsidiary, WTEF East. *See generally* Sept. 13

Order.  The court also rejected WTEF's effort to bring WTEF East into the case as a co-plaintiff.  *See id*. at 11–14.  What remains of the case, then, is Defendant's counterclaim to recover fees not paid under the Architect Agreement.

Plaintiff now seeks reconsideration of the court's Order, or alternatively, certification of the standing question for interlocutory review.  *See* Pl.'s Mot. for Recons., ECF No. 62 [hereinafter Pl.'s Mot.], Br. in Supp. of Pl.'s Mot., ECF No. 62-1 [hereinafter Pl.'s Br.].  For the reasons stated below, the court denies Plaintiff's Motion.

### III.  LEGAL STANDARD

WTEF seeks reconsideration under three Federal Rules of Civil Procedure: 54(b), 59(e), and 60(b).  *See* Pl.'s Br. at 2–3.  Only Rule 54(b) applies, however.  Rules 59(e) and 60(b) come into play only after an order of final judgment.  *See Cobell v. Jewell*, 802 F.3d 12, 19 (D.C. Cir. 2015) ("Rule 59(e) is a motion for reconsideration that is filed only *after* the district court's entry of a final judgment.");  Fed. R. Civ. P. 60(b) (providing "grounds for relief from a *final* judgment" (emphasis added)).  By contrast, Rule 54(b) "operates while a case is still ongoing in district court and before any appealable final judgment has been entered."  *Cobell*, 802 F.3d at 19; *see* Fed. R. Civ. P. 54(b).  Here, the court's Order left Defendant's counterclaim for resolution at trial.  The Order therefore "adjudicat[ed] fewer than all the claims or the rights and liabilities of fewer than all the parties."  Fed. R. Civ. P. 54(b); *see Campbell v. US Dep't of Justice*, 231 F. Supp. 2d 1, 7–8 (D.D.C. 2002).  Thus, because the case "is still ongoing," *see Cobell*, 802 F.3d at 19, only Rule 54(b) governs WTEF's motion.

Rule 54(b) provides that "[a] court may revise its own interlocutory orders at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  *Ofisi v. BNP Paribas, S.A.I*, 285 F. Supp. 3d 240, 243 (D.D.C. 2018).  Relief under the rule is

available "as justice requires," a standard that reflects the flexibility afforded courts under the rule. *Cobell*, 802 F.3d at 25 (internal quotation marks omitted). Reconsideration "may be warranted where the court has 'patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or [where] a controlling or significant change in the law has occurred.'" *US ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 269 (D.D.C. 2012) (quoting *Arias v. DynCorp*, 856 F. Supp. 2d 46, 52 (D.D.C. 2012)). "These considerations leave a great deal of room for the court's discretion and, accordingly, the 'as justice requires' standard amounts to determining 'whether [relief upon] reconsideration is necessary under the relevant circumstances." *Lewis v. District of Columbia*, 736 F. Supp. 2d 98, 102 (D.D.C. 2010) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)).

## IV. DISCUSSION

### A. Motion for Reconsideration

Plaintiff's request for reconsideration has three components. *See* Pl.'s Mot. at 1–2. First, Plaintiff asserts that the court incorrectly concluded that Plaintiff assigned its professional malpractice claim to WTEF East. Second, Plaintiff insists that the court erred in holding that it lacked standing to assert a claim for breach of contract because the court misstated the "shareholder standing rule"; mischaracterized WTEF as a "stranger" to the Architect Agreement; and failed to recognize WTEF as an intended third-party beneficiary of the Architect Agreement. Finally, Plaintiff asserts that the court wrongly determined that WTEF East could not join the suit under Federal Rules of Civil Procedure 15, 21, or 24. The court takes each of these arguments in turn.

1.     *Plaintiff's Tort Claim*

a.     The parties agree that WTEF did not assign its tort claim

The court admits error in its standing analysis as to WTEF's professional negligence claim. It is well-established that "'standing is not dispensed in gross' but instead may differ claim by claim." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017)). The court made a mistake by treating the breach of contract and malpractice claims co-extensively for purposes of assessing standing. *See* Sept. 13 Order at 6 (ruling that "only WTEF East has standing to enforce the Agreement or to sue Defendant for breach of any common law duty arising therefrom"). Instead, the court should have "address[ed] seriatim" WTEF's standing to bring its contract and tort claims. *Elec. Privacy Info. Ctr.*, 878 F.3d at 377. The court corrects that error now.

WTEF asserts that its assignment of "all of [its] right, title, and interest" in the Architect Agreement did not extinguish the duty of care that Clark Nexsen owed to WTEF *directly*. Pl.'s Br. at 3–5; Pl.'s Reply in Supp. of Mot. for Recons., ECF No. 66 [hereinafter Pl.'s Reply], at 2–4. According to WTEF, "[n]othing in the Assignment Agreement purported to assign or release Clark Nexsen from any tort liability to WTEF." Pl.'s Reply at 3. Unexpectedly, Clark Nexsen agrees. In its view, "[w]hile tort claims are generally assignable, no tort had been committed at the time of the [Assignment Agreement] on December 30, 2011," so "no *existing* [tort] claim could be assigned" to WTEF East as of December 30, 2011. Def.'s Suppl. Br., ECF No. 68, at 5 (citing *Boyce v. Boyce*, 541 A.2d 614, 617 n.7 (D.C. 1988) ("An inchoate tort is not assignable.")). Stated differently, Clark Nexsen agrees that the Assignment Agreement did not, as a matter of law, divest WTEF of any inchoate tort claim rooted in an independent duty that Clark Nexsen owed to WTEF

9

(as opposed to WTEF East). Because there is no dispute as to whether WTEF retained the right to assert a tort claim against Clark Nexsen notwithstanding the Assignment Agreement, the court, in the interest of justice, reverses its decision that WTEF lacked standing to sue Defendant for professional malpractice.[2]

WTEF's standing to assert a tort claim does not, however, end the court's analysis. In its motion for summary judgment, Clark Nexsen also moved for judgment on the ground that Plaintiff's claims—tort and contract—are time-barred. The court did not reach that issue because of its standing determination. The court now addresses the limitations defense as to the tort claim, and agrees with Defendant that the statute of limitations bars WTEF's professional malpractice claim.[3]

### b. WTEF's tort claim is barred by the statute of limitations

The parties agree that a three-year statute of limitations applies to this action. *See* D.C. Code § 12-301(3). Plaintiff filed this action on November 10, 2015. *See* Compl. So, to satisfy

---

[2] The court notes that the principle that an inchoate tort cannot be assigned as matter of law in the District of Columbia, which both parties cite, rests on a thin reed. The footnote in *Boyce* that the parties cite, 541 A.2d at 617 n.7, rests on an 1883 decision, which simply held that a client cannot assign a claim for unliquidated damages, in whole or in part, to his attorney, *see Lamont v. Washington & G.R. Co.*, 1882 WL 20221, at *4 (D.C. Oct. 15, 1883) ("Here is a claim for unliquidated damages, which is, in its very nature, incapable of being assigned in whole or in part to the attorney."). That narrow principle, of course, has no application here. In any event, because the parties agree that there was no assignment of WTEF's tort claim to WTEF East, the court need not delve into the esoteric question of the assignability of an inchoate tort.

[3] Clark Nexsen once again urges the court to find that the economic loss rule—which "bars recovery of purely economic losses in negligence" actions, *Aguilar v. RP MRP Wash. Harbour*, LLC, 98 A.3d 979, 985–86 (D.C. 2014)—precludes WTEF from seeking to recover economic losses purportedly caused by Clark Nexsen's negligent professional services. WTEF responds that the economic loss doctrine does not preclude its tort claim and that WTEF can still recover economic damages stemming from Clark Nexsen's breach of its professional duty of care because it enjoyed a "special relationship" with Clark Nexsen pursuant to which Clark Nexsen "undertook obligations that would 'implicate [WTEF's] economic expectancies.'" *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 204 (D.C. 2017) (quoting *Aguilar*, 98 A.3d at 985); *see also McDowell v. CGI Federal, Inc.*, No. 15-cv-1157, 2017 WL 2392423, at *4 (D.D.C. June 1, 2017) (citing *Whitt*, 157 A.3d at 205–06) ("Where such a 'special relationship' exists, the defendant owes an independent duty of care to the plaintiff and it is proper to hold the defendant liable for a breach of that duty."). The court need not wade into this dispute in light of its ruling that WTEF's claim is time-barred.

the statute of limitations, Plaintiff's cause of action for professional negligence cannot have accrued more than three years before that date, i.e., earlier than November 10, 2012.

The statute of limitations begins to run "from the time the right to maintain the action accrues." D.C. Code § 12-301. "'Accrue' is not defined but '[a]ctions usually accrue when they come into existence.'" *Hensel Phelps Constr. Co. v. Cooper Carry Inc.*, 861 F.3d 267, 272 (D.C. Cir. 2017) (quoting *Felter v. Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007)). Critically, "[t]he task of identifying the moment of accrual has been left to the courts." *Farris v. Compton*, 652 A.2d 49, 54 (D.C. 1994).

WTEF makes two arguments to avoid the limitations bar. First, WTEF maintains that "the critical date for the statute of limitations is July 14, 2014," which is "the date on which WTEF requested mediation with Clark Nexsen by certified letter under Section 8.2 of the contract." *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. & Mot. in Limine, ECF No. 50 [hereinafter Pl.'s Summ. J. Opp'n], at 8. Put another way, WTEF argues that, because it made a *mediation demand* within three years, its *filing of this action* is timely. Second, WTEF argues that the "discovery rule" applies and the rule's operation delayed the accrual date until January 2013, when WTEF first moved into the facility and began to learn about Clark Nexsen's breaches, thereby rendering its suit filed in November 2015 timely. *Id.* at 7–8. Both arguments are unavailing.

> i.      *Plaintiff's mediation demand did not toll the statute of limitations*

WTEF's first argument is based on a complete misreading of the Architect Agreement. According to WTEF, section 8.2.1 provides that "[a]ny claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to binding dispute resolution selected in this Agreement within the period specified by applicable

law." Pl.'s Summ. J. Opp'n at 8–9.  But that is not what section 8.2.1 says.  Rather section 8.2.1

of the contract provides: "Any claim, dispute or other matter in question arising out of or related

to this Agreement shall be subject to mediation as a condition precedent to binding dispute

resolution."  Architect Agreement, Art. 8, § 8.2.1.  Full stop.  Period.  That clause does not, as

WTEF claims, go on to require that the mediation demand be made "within the period specified

by applicable law."  *See id.*  The additional text that Plaintiff quotes is contained not in

section 8.2.1, but in section 8.1.1, a clause that pertains to the bringing of "claims and causes of

action."  That section provides that the parties "shall commence *all claims and causes of*

*action* . . . in accordance with the method of binding dispute resolution selected in this Agreement

within the period specified by applicable law."  *Id.* § 8.1.1 (emphasis added).  Critically, the

"binding dispute resolution" selected by the parties in the Architect Agreement is "[l]itigation in a

court of competent jurisdiction."  *Id.* § 8.2.4.  Thus, the entire premise of WTEF's argument that

the date of mediation is what counts for statute of limitations purposes is flat wrong.

A charitable reading of WTEF's argument would be that its filing of the mediation demand

equitably tolled the limitations period for its claims.  But that assertion would be wrong, too.

WTEF cites no authority whatsoever for that proposition, and the most analogous case that this

court has found is to the contrary.  *See Shailendra Kumar, P.A. v. Dhanda*, 43 A.3d 1029, 1042–

43 (Md. 2012) (rejecting equitable tolling during "the pendency of mandatory, non-binding

arbitration").  Moreover, the Architect Agreement cannot be read to permit equitable tolling.

While Article 8 requires mediation as a condition precedent to filing suit, it clearly provides that a

request for mediation "may be made concurrently with the filing of a complaint."  *See* Architect

Agreement, Art. 8, § 8.2.2.  In such circumstances, the Agreement provides that the filed action

"shall be stayed for 60 days from the date of filing, unless stayed for a longer period by agreement

of the parties or court order." *See id.* The Architect Agreement therefore expressly contemplates the filing of a protective action during the pendency of mediation precisely to avoid issues with the statute of limitations. Plaintiff's counsel conceded as much during oral argument on the motion for reconsideration, admitting that the "better course in hindsight" would have been for Plaintiff to submit the mediation demand and concurrently file suit. Hr'g Tr., ECF No. 70, at 20. Accordingly, because the Architect Agreement itself cannot be read to equitably toll the limitations period during the pendency of mediation, the court rejects Plaintiff's attempt to rely on July 14, 2014, as the operative date.

## ii.    *The discovery rule is inapplicable*

The court proceeds to ask: When did the statute of limitations began to run in this matter? Typically, "[w]here the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc). Sensing that the general rule would not help its cause, Plaintiff urges application of the discovery rule, which the D.C. Court of Appeals has applied in circumstances when an injury is "not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred." *See Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1201 (D.C. 1984). Pursuant to the discovery rule, "the claim does not accrue until the plaintiff, exercising due diligence, has 'discovered or reasonably should have discovered all of the essential elements of her possible cause of action, *i.e.*, duty, breach, causation, and damages.'" *Farris v. Compton*, 652 A.3d 49, 54 (D.C. 1994) (quoting *Colbert*, 641 A.2d at 473). The purpose of the discovery rule is "[t]o avoid the injustice that periods of limitation may work upon those parties that did not know, and could not have reasonably known, that a cause of action

existed." *Capitol Place I Assocs. LLP v. George Hyman Constr. Co.*, 673 A.2d 194, 199 (D.C. 1996).

"Application of the discovery rule . . . is not universal," and is to be applied on a limited "'case by case basis.'" *Commonwealth Land Title Ins. Co. v. KCI Tech., Inc.*, 297 F. Supp. 3d 106, 110 (D.D.C. 2018) (quoting *Ehrenhaft*, 483 A.2d at 1204), *appeal docketed*, No. 18-7051 (D.C. Cir. Apr. 16, 2018). The D.C. Court of Appeals has identified four factors that courts should consider when deciding whether to apply the discovery rule in the construction context. *See Ehrenhaft*, 483 A.2d at 1204; *see also Woodruff v. McConkey*, 524 A.2d 722, 727–28 (D.C. 1987) (evaluating application of discovery rule using four-factor test). They are: (1) whether the plaintiff is a lay person and may therefore justifiably rely on the professional skills of those hired to perform the work; (2) whether the deficiency in design or construction was latent; (3) whether the equities favored protecting the plaintiff as weighed against potential prejudice to the defendant; and (4) whether judicial economy would be served by its application. *See Ehrenhaft*, 483 A.2d at 1202–03; *Commonwealth Land Title Ins. Co.*, 297 F. Supp. 3d at 111. Whether the discovery rule applies is a question of law. *See Diamond v. Davis*, 680 A.2d 364, 365 (D.C. 1996).

The D.C. Court of Appeals has twice addressed whether the discovery rule applies in negligence actions in the context of a construction dispute. In *Ehrenhaft*, the court applied the discovery rule in a residential homeowner's action involving a claim of professional negligence and breach of contract by an architect. *See* 483 A.2d at 200. By contrast, the court declined to apply the discovery rule in *Capitol Place*, reasoning that the plaintiff was a sophisticated national organization who partnered with a commercial developer and had knowledge of the construction defects well before demanding arbitration. *See* 673 A.2d at 200. Applying the above four factors,

the court concludes that this case is much closer to *Capitol Place* than *Ehrenhaft*, and therefore declines to apply the discovery rule here.

As to the first factor, Plaintiff is more like the sophisticated organization in *Capitol Place* than the homeowner in *Ehrenhaft.* WTEF is an established nonprofit organization that raised nearly $8 million to fund the East Capitol Campus project. Pl.'s Summ. J. Opp'n, Pl.'s Statement of Material Facts in Dispute, ECF No. 50-1 [hereinafter Pl.'s Stmt.], ¶ 2. WTEF's Board of Directors is comprised of more than 40 accomplished individuals, some of whom are attorneys who have provided legal services to WTEF in the past. *See* Def.'s Summ. J. Mot., Def.'s Statement of Undisputed Facts, ECF No. 46-3 [hereinafter Def.'s Stmt.], ¶¶ 23–24.[4] For purposes of the East Capitol Campus project, WTEF established a design committee, which included among its members David Roodberg, the CEO of the commercial real estate development and management firm Horning Brothers, and Alberto Omeechevarria, then president of Biscayne Contractors. Def.'s Stmt. ¶ 8; *see* Def.'s Summ. J. Reply at 18. Additionally, WTEF hired outside consultants to support the project and advise WTEF—specifically, Gilbane Building Company and Advisors, LLC. *See* Def.'s Stmt., ¶¶ 1, 62, 87, 89. Gilbane served as WTEF's pre-construction advisor, and its responsibilities included budgeting, scheduling, and advising WTEF on the construction of the East Capitol Campus. *See* Def.'s Summ. J. Mot., Ex. L, ECF No. 46-15, at 7 (admitting in response to Defendant's requests for admissions that WTEF engaged Gilbane to act as its pre-construction advisor); Def.'s Summ. J. Mot., Ex. A, ECF No. 46-4 [hereinafter Albanese Dep.], at 6:16–6:19,

---

[4] The court largely accepts as undisputed the 141 factual assertions put forward by Defendant at summary judgment because Plaintiff did not bother to dispute them. *See generally* Def.'s Stmt. The court's Order on summary judgment briefing clearly states that "[t]he court may treat as admitted facts identified by the moving party in its statement of material facts that are not controverted in the opposing party's responsive statement." Order, ECF No. 45, ¶ II.D. Plaintiff did not heed that warning, as its counter-statement to Defendant's statement of facts does not respond to each fact asserted by Defendant, as the court directed, *see id.* ¶ II.B. *See generally* Pl.'s Stmt.

32:7–32:11. WTEF later hired Advisors for "construction and project management services" during the construction phase of the project to "'step into [its] shoes' and ensure that [its] best interests [were] carefully represented." *See* Def.'s Summ. J. Mot., Ex. U, ECF No. 46-24, at 5 (Exhibit A to Advisors, LLC Agreement, titled "Scope of Services"). Advisors' responsibilities included, among others, monitoring, assisting, and supporting the permit application process to obtain all permits necessary to construct the East Capitol Campus facility; participating in Owner/Architect/Contractor meetings on a weekly or bi-weekly basis; and monitoring and reporting on the progress of construction. *See id.* at 9–11. WTEF's effort to cast itself as an unsophisticated entity is thus simply not convincing. *Cf. Capitol Place*, 673 A.2d at 200 (noting that the "appellant was partners with a developer, which had extensive knowledge of commercial construction and had an architect on its staff to oversee this project" and that the "appellant hired its own outside expert on at least two occasions after appellee apparently refused to accept responsibility for the leakage").

As to the second factor—the latency of the design deficiencies—the errors and omissions of which Plaintiff complains largely pertain to the "original design documents" issued by Clark Nexsen, *see* Compl. ¶ 9(e), (h), (i), (j), (k), and more generally to Clark Nexsen's "design errors," *see id.* ¶ 9(a), (b), (f), (g). Any deficiencies in Clark Nexsen's designs were discoverable and correctable as early as October 2011, when Clark Nexsen's construction documents were submitted to the DCRA for a building permit, or, at the latest, March 1, 2012, when the building permit was issued and construction based on Clark Nexsen's designs was underway. Notably, Gilbane's pre-construction manager, Anthony Albanese, met with WTEF's design committee for progress meetings every two to three weeks to go over Clark Nexsen's design drawings and answer WTEF's questions. Albanese Dep. at 6:20–7:8, 20:7–21:16. During one of these meetings,

Gilbane, together with WTEF's design committee, reviewed "every drawing iteration" produced by Clark Nexsen at that point. *See id.* at 20:10–20:13; *see also id.* at 25:3–27:17 (Albanese recalling that he had a discussion with the project owner about heating and cooling the office and classroom spaces around the tennis court). Advisors also reviewed the plans. *See, e.g.*, Def.'s Summ. J. Mot., Ex. K, ECF No. 46-14 [hereinafter Rossides Dep.], at 79:17–81:8. WTEF therefore cannot reasonably rely on the latency of the design defects to advocate for the discovery rule.

The third factor—balancing Plaintiff's interest against prejudice to Defendant—likewise weighs against Plaintiff. In light of the court's conclusion that a number of the "problems" in the East Capitol Campus's design were discoverable by Plaintiff well within the period provided by the statute of limitations, applying the discovery rule to Plaintiff's benefit would "frustrate the policies underlying the statute of limitations." *See Ehrenhaft*, 483 A.2d at 1203. As such, the fourth factor also weighs against Plaintiff, as it is in the interest of judicial economy that the court "adjudicate more timely complaints." *See Woodruff*, 524 A.2d at 728. Plaintiff here made a mediation demand on July 14, 2014—a demand that apparently that went unrequited, *see* Pl.'s Stmt. ¶ 12—yet waited more than 15 months before filing suit on November 10, 2015. Although the court "applaud[s] [WTEF's] efforts to avoid litigation through informal attempts at resolving disputes, there is a point where a party must decide to either bring a recalcitrant party before the court or forgo that option." *Capitol Place*, 673 A.2d at 200.

Having considered the foregoing factors and concluded that Plaintiff is a sophisticated party who benefitted from the hired expertise of others and was on notice of any design deficiencies

in Clark Nexsen's construction documents well within the statute of limitations period, the court holds that the discovery rule is inapplicable to WTEF's claim.

### iii.  *Plaintiff's claim is untimely*

Without the benefit of the discovery rule, Plaintiff's tort claim is barred by the statute of limitations.  Clark Nexsen identifies March 1, 2012—the date when the DCRA issued a building permit to WTEF East—as the critical date for statute of limitations purposes, because by that date Clark Nexsen's design services were completed and WTEF would have been on notice as to any design defects.  Plaintiff, on the other hand, points to November 13, 2012, as the date its cause of action accrued because that is the date Clark Nexsen issued the Certificate of Substantial Completion.  Defendant has the better of the argument.

Plaintiff's tort claim alleges, in the main, that Clark Nexsen failed to perform its *design* services according to an architect's professional standard of care.  *See* Compl. ¶ 9(a), (b), (e), (f), (g), (h), (i), (j), (k).  These tort claims accrued no later than March 1, 2012, when DCRA issued the building permit, marking the transition from the design phase of the project to the construction phase of the project.  Def.'s Summ. J. Mot., Ex. Z, ECF No. 46-29.  Prior to this date, any flaws in the design would have been known to WTEF.  As already noted, Plaintiff's outside experts, Gilbane and Advisors, reviewed the project design.  Gilbane discussed it with WTEF's design committee on a regular basis.  Additionally, WTEF engaged a permit expeditor, who reviewed the set of Clark Nexsen-issued design drawings, submitted them to the DCRA on WTEF's behalf, and then "walked" these drawings through the DCRA in order to obtain the permit and begin construction.  *See, e.g.*, Rossides Dep. at 68:10–69:15; 82:12–83:1; 104:8–104:18.  And, finally, it is undisputed that "[e]ach phase of the design was approved by someone on behalf of the Owner, whether it was WTEF or WTEF East directly, or one of the Owner's agents."  Def.'s Stmt. ¶ 86.

Thus, any issues with Clark Nexsen's design documents "accrued," at the latest, when Clark Nexsen's design services were completed on March 1, 2012, as that is when WTEF's professional malpractice claim "c[a]me into existence.'" *See Hensel Phelps Constr. Co.*, 861 F.3d at 272.

The remaining allegations that form the basis for WTEF's professional malpractice claim pertain to Clark Nexsen's purported failure to give notice of an improperly aligned storefront wall, Compl. ¶ 9(c), and its responsibility for the improper drainage of a condensate line, *id.* ¶ 9(d). Assuming without deciding that the injury caused by these alleged negligent actions "accrued" at a different time than WTEF's design allegations, negligence claims based on these assertions are likewise time-barred. First, the record supports Clark Nexsen's assertion that WTEF was on notice of the storefront wall misalignment as early as August 16, 2012. *See* Def.'s Summ. J. Mot., Ex. AC, ECF No. 46-32 (August 16, 2012 email from Mark Kost to WTEF design committee outlining proposed solution to exterior wall misalignment); Def.'s Summ. J. Mot., Ex. I, ECF No. 46-12, 167:10–179:12, 256:1–259:11. Additionally, the misaligned wall was constructed and therefore apparent to WTEF prior to November 9, 2012, when WTEF and Clark Nexsen conducted the final site walkthrough. *See* Def.'s Summ. J. Mot., Ex. AA, ECF No. 46-30, at 6–27; *see also* Def.'s Summ. J. Mot., Ex. AD, ECF No. 46-33, at 3. Moreover, it is undisputed by Plaintiff that the condensate line had been constructed and therefore apparent prior to the November 9, 2012, walkthrough. Def.'s Stmt. ¶ 117.

Thus, Plaintiff's professional negligence claim is untimely.

### 2.    *Plaintiff's Contract Claim*

The court turns next to WTEF's assertion that the court erred when it concluded that, in light of the assignment to WTEF East, WTEF lacked standing to bring its breach of contract claim against Defendant. To that end, WTEF asserts that the court: (1) misstated and misapplied the

"shareholder standing rule" to WTEF, a nonprofit organization; (2) incorrectly cast WTEF as a "stranger" to the Architect Agreement; and (3) failed to recognize WTEF as an intended third-party beneficiary of the Agreement. *See* Pl.'s Br. at 5–11. These arguments, however, do little more than rehash WTEF's previous arguments. For that reason alone, the motion for reconsideration is denied. *See Westrick*, 893 F. Supp. 2d at 268–69 ("A court may deny a motion for reconsideration when it raises 'arguments for reconsideration the court has already rejected on the merits.'" (alterations omitted) (quoting *McLaughlin v. Holder*, 864 F. Supp. 2d 134, 141 (D.D.C. 2012)).

In any event, none of these arguments warrant altering the court's conclusion on the merits. Plaintiff, as it did at summary judgment, argues that the shareholder standing rule should not apply to nonprofit entities, but fails to offer authority to support that proposition. As the court explained at summary judgment, WTEF wholly owns WTEF East, an arrangement that squarely implicates the prudential purposes of the shareholder standing rule and warrants its application. Sept. 13 Order at 8–9. Still, WTEF asserts that, under *Franchise Tax Board of California v. Alcan Aluminum Ltd.*, 493 U.S. 331 (1990), the shareholder standing rule does not preclude its suit because it has a "direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *See* Pl.'s Br. at 6–7 (quoting *Franchise Tax Bd. of Cal.*, 493 U.S. at 336). According to WTEF, its sublease of the East Capitol Campus premises constitutes such a "direct, personal interest." *Id.* at 7. To fall within the exception to the shareholder standing rule, however, "the plaintiff's injury must be distinct from and cannot be 'derivative' of injuries sustained by the affiliated corporation." *Secs. Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 408 (D.D.C. 2014). Here, WTEF fails to allege a "'special injury' that does not derive from the injury to the corporation," and therefore does not

fall within the exception.  *See Cheeks v. Fort Myers Constr. Co.*, 722 F. Supp. 2d 93, 109 (D.D.C. 2010); *see also Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999) (holding that shareholders' injuries as guarantors of corporation's debt obligations were directly tied to the fate of the corporation and therefore did not overcome general shareholder standing rule).  WTEF's purported "legal interest in the real property," derived from the sublease, creates no separate rights in favor of WTEF with regard to the design and construction of the East Capitol Campus.  All of the contractual rights under the Architect Agreement flowed to WTEF East after the assignment, and so WTEF's claimed injury is completely derivative of the obligations Clark Nexsen owed to WTEF East.  As a result, the exception to the shareholder standing rule does not apply.

Next, Plaintiff asserts that it is not a "stranger" to the Architect Agreement because under the Assignment Agreement it remained jointly and severally liable with WTEF East for payments to Clark Nexsen.  *See* Pl.'s Br. at 8 ("WTEF thus retained financial responsibilities and burdens associated with the contract.").  WTEF makes too much of the court's reference to it as a "stranger" to the Architect Agreement.  *See* Sept. 13 Order at 8–9.  The court used that term as the D.C. Court of Appeals did in *Flack v. Laster*, 417 A.2d 393 (D.C. 1980): to mean a third party to a contract. *See id.* at 399 n.11.  The Assignment Agreement rendered Plaintiff a third party to the Architect Agreement and thus a "stranger" to it.  *See Wash. Canoe Club v. D.C. Zoning Comm'n*, 889 A.2d 995, 1002 n.5 (D.C. 2005) (finding that because "petitioners are not parties to either of these documents," they lacked standing to assert that the plans were nonconforming to the terms of those documents); *Stuart v. Am. Sec. Bank*, 494 A.2d 1333, 1339 (D.C. 1985) (holding that the appellant, "a stranger to the deed of trust," could not "sue to enforce it or to recover damages").  WTEF therefore cannot sue to enforce the Architect Agreement's terms.

Finally, Plaintiff again attempts to recast itself as a third-party beneficiary to the Assignment Agreement. It is not. Section 10.5 of the Architect Agreement expressly provides that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner [i.e., Plaintiff] or Architect." Architect Agreement, Art. 10, § 10.5. WTEF offers no response to the plain text of the contract.

In sum, in making these arguments, WTEF fails to demonstrate: "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error," as to the court's ruling on its breach of contract claim. *See Murphy v. Exec. Office for U.S. Attorneys*, 11 F. Supp. 3d 7, 8 (D.D.C. 2014). Accordingly, Plaintiff offers no reason for the court to revisit its decision holding that Plaintiff lacked standing to assert its breach-of-contract claim. The court therefore affirms its dismissal of Count I for lack of standing.

### 3.  The Addition of WTEF East Is Improper

The court turns to Plaintiff's request that the court reconsider its decision to reject adding WTEF East as a co-plaintiff to this suit under Federal Rules of Civil Procedure 15, 21, and 24. As before, none of these Rules allow WTEF East to join the suit.

Taking the Rules in reverse order, WTEF offers no valid reason for the court to reconsider its decision that WTEF East could not intervene under Rule 24 because WTEF East, "the person seeking to intervene," did not make a motion to do so. *See* Sept. 13 Order at 13–14 (quoting 7C Charles Alan Wright, et al., Fed. Prac. & Proc. § 1914 (3d ed. 2015)). Although Plaintiff complains that the court's approach "elevates form over substance," Pl.'s Br. at 12, it cites no case for the proposition that a *party* can move on behalf of a putative intervenor to enter the case. What WTEF calls "elevating form over substance" is simply following what the text of Rule 24 requires. Moreover, the court rejects Plaintiff's first-time request to construe its original Motion for Leave

22

to Amend as a motion for intervention *by WTEF East*. Now, *that* would be elevating form over substance.

The court will, however, reconsider its refusal to add WTEF East as a party under Rules 15 and 21. The court originally concluded that WTEF could not join WTEF East under those rules because, absent standing to assert its claims, the court lacked subject-matter jurisdiction to add a party. *See* Sept. 13 Order at 11–13 (citing *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 114 (D.D.C. 1999)). But that rationale must fall away, as the court has recognized WTEF's standing to bring its negligence claim.

Yet even with standing, WTEF cannot now add WTEF East because doing so would be futile. *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 794–95 (D.C. Cir. 1983). As with WTEF's claims, WTEF East's claims would be barred by the statute of limitations. *See* Pl.'s Summ. J. Opp'n at 3 ("Adding WTEF East as a co-plaintiff will change none of the underlying claims and issues or require additional discovery.").[5] Joining WTEF East therefore would not allow WTEF to avert defeat.

WTEF nevertheless insists that WTEF East's claims would not be time barred because they would "relate back" to the date of the Complaint, thereby avoiding the statute of limitations bar. *See* Pl.'s Reply at 10; Pl.'s Notice of Suppl. Authority, ECF No. 56. WTEF, however,

---

[5] To be sure, WTEF East would have standing to bring a breach of contract claim, where WTEF does not. But any breach of contract claim WTEF East could bring would likewise be time-barred because, according to the terms of the Architect Agreement, *see* Art. 8, § 8.2.2 (providing that a mediation demand "may be made concurrently with the filing of a complaint"), WTEF East could have brought suit as early as July 14, 2014, when it made its mediation demand on Clark Nexsen. *See Hensel Phelps*, 861 F.3d at 273 (holding that breach of contract action "accrued prior to substantial completion" where the "plain terms" of the parties' written agreement "expressly contemplated the possibility of litigation before [the Project's] completion"). The mediation demand identified eight of the eleven design and construction flaws that later became the subject of WTEF's complaint. *Compare* Compl. ¶ 9(a), (b), (c), (e), (h), (i), (j), (k), *with* Mediation Demand. Had WTEF East filed a protective suit concurrently with its mediation demand, as the Architect Agreement permits, its cause of action for breach of contract would have been timely, even as to the design defects. Such a claim would have accrued no later than March 1, 2012, the date the building permit issued.

misunderstands the procedural flaw inherent in its claims. Relation back would operate to treat WTEF East's claims as having been filed on the same day as WTEF's—November 10, 2015. But, as the court already has held, WTEF's filing on that date was untimely. *See supra* IV.A.1. Consequently, relation back would not help WTEF East.

*       *       *

In summary, although the court reverses its decision that WTEF lacked standing to assert its tort claim, the court affirms entry of judgment in favor of Clark Nexsen on the alternative grounds set forth above.

## B.       Motion for Certification for Interlocutory Appeal

As an alternative to its request for reconsideration, Plaintiff asks the court to certify its September 13, 2017, Order for interlocutory appeal, asserting that the issues raised in its Motion for Reconsideration warrant immediate review by the D.C. Circuit. *See* Pl.'s Br. at 12–13. Defendant opposes certification on the ground that an interlocutory appeal would serve only to delay the progress of litigation. *See* Def.'s Br. in Opp'n to Pl.'s Mot. for Recons., ECF No. 63, at 2, 18–19.

Pursuant to 28 U.S.C. § 1292(b), a district court has discretion to certify a non-final order for interlocutory review when "(1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 100 (D.D.C. 2003) (citing 28 U.S.C. § 1292(b)(2)). As the party seeking interlocutory review, WTEF "bears the burden of showing that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgement." *Virtual Def. & Dev. Int'l Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 22 (D.D.C.

2001) (internal quotation marks omitted). There is no dispute as to whether the first element is satisfied, so the court focuses on the second and third elements.

Section 1292(b) requires that there be a substantial ground for difference of opinion as to the controlling question of law. As Defendant points out, the lion's share of WTEF's argument for interlocutory review are merely challenges to the court's interpretation and application of settled principles of law, and therefore do "[no] more than show continued disagreement" with the court's decision. *See Graham v. Mukaskey*, 608 F. Supp. 2d 56, 56 (D.D.C. 2009). Such "[m]ere disagreement, even if vehement, with a court's ruling . . . does not establish a 'substantial ground for difference of opinion' sufficient to satisfy the statutory requirements for an interlocutory appeal." *Judicial Watch, Inc. v. Nat'l Energy Pol. Dev. Grp.*, 233 F. Supp. 2d 16, 22 (D.D.C. 2012) (citation omitted).

Moreover, while the issue of whether the shareholder standing rule applies to non-profit corporations is one of first impression in this Circuit, that fact alone does not "require, or in this instance, justify, certification of an interlocutory appeal." *See id.* at 27. Plaintiff's invocation of *Kennedy v. District of Columbia*, 145 F. Supp. 3d 46 (D.D.C. 2015), to persuade the court otherwise is unavailing. In that case, the court certified for interlocutory appeal the legal question of the applicability of the Americans with Disabilities Act Amendments Act of 2008 to an accommodation request made before the effective date of the Act, but renewed after that date. *Kennedy*, 145 F. Supp. 3d at 51. True, the court observed that the issue was "one of first impression" in this Circuit, but it did not certify the issue for interlocutory appeal on that ground alone. *Id.* at 52. Instead, the court found that the issue was one about which "there may be a substantial difference of opinion among judges whether it is correct"—and therefore appropriate for interlocutory appeal—based on the existence of a District of Connecticut opinion and an EEOC

Guidance Document squarely addressing the legal issue and reaching a conclusion contrary to the district court. *Id.* (internal quotation marks omitted). By contrast, here, Plaintiff has not identified *any* on-point conflicting authority on the issue of the applicability of the shareholder standing rule to non-profit corporations. Accordingly, Plaintiff has not shown the existence of a substantial ground for difference of opinion on the controlling questions of law raised in the Order.

The third element required by section 1292(b) is likewise lacking here, as WTEF has not shown that an immediate appeal of the court's Order will "materially advance the ultimate termination of the litigation." WTEF asserts that certifying the Order for interlocutory appeal will move this case towards its conclusion because "it will avoid the need to litigate whether Clark Nexsen breached the contract twice." Pl.'s Reply at 11. In the current posture, WTEF posits, it can appeal the court's dismissal of its breach of contract and tort claims only after the court conducts a trial on the merits of Clark Nexsen's counterclaim. According to WTEF, if the court certifies its Order for interlocutory appeal, and the D.C. Circuit reverses the court's rulings, this court will have avoided conducting a second trial to address WTEF's claims. But "[t]he relevant question is whether immediate appeal would *materially* advance the ultimate termination of the litigation." *U.S. House of Representatives v. Burwell*, No. 14-cv-1967, 2015 WL 13699275, at *1 (D.D.C. Oct. 19, 2015). Here, waiting for the resolution of an interlocutory appeal would not do so. Once calendared, trial on Defendant's counterclaim can be accomplished in less than a week. At that point, both this court's Order and the results of the trial could be appealed. The court therefore concludes that granting an interlocutory appeal would more likely impede—rather than materially advance—the progress of this litigation.

### C.      WTEF's Jury Demand

The court's acknowledgment that WTEF has standing to assert its tort claim directly affects one outstanding procedural matter—whether WTEF made a valid jury demand with respect to Clark Nexsen's counterclaim. *See* Def.'s Mot. in Limine to Bar Evidence Supporting WTEF's Counter-Allegations of Breach of Contract, ECF No. 61 [hereinafter Def.'s Mot. in Limine]; Br. in Supp. of Def.'s Mot. in Limine, ECF No. 61-1, at 9. Clark Nexsen argues that "WTEF waived its request for trial by jury [as to the counterclaim] because WTEF lacked standing to file its Complaint, through which WTEF demanded a jury trial." Def.'s Reply in Supp. of Def.'s Mot. in Limine, ECF No. 65, at 13. The premise of Clark Nexsen's argument is, of course, no longer valid, as the court now concludes that WTEF did have standing to bring its malpractice claim. Accordingly, because WTEF had standing as to one claim at the time it "request[ed] a trial by jury of all issues triable of right," i.e., when it filed its Complaint, *see* Notice of Removal, Pl.'s Jury Demand, ECF No. 1-3, WTEF preserved its right to a jury on Defendant's counterclaim. *See* 9 Charles Alan Wright, et al., Fed. Prac. & Proc. Civ., § 2318 (3d ed. 2018) ("If a general demand for jury is made without specifying any issues, it will be regarded as a demand for jury trial on all the issues in the case."). *Compare Rosen v. Dick*, 639 F.2d 82, 91 (2d Cir. 1980) ("The general jury demand extends to the issues covered in subsequent pleadings because the demander has already told his opponent that he wants a jury trial to the extent guaranteed by the Seventh Amendment."), *with Mount Everest Ski Shops, Inc. v. Ski Barn, Inc.*, 736 F. Supp. 531, 532–33 (D. Vt. 1989) (holding that plaintiff's demand for trial by jury on "each and every count of the complaint" did not reach defendant's counterclaim). Clark Nexsen's counterclaim therefore will be tried before a jury.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court denies Plaintiff's Motion for Reconsideration, or, in the Alternative, for Certification of an Interlocutory Appeal.   As before, the court maintains jurisdiction over Defendant's pending counterclaim.   This matter will proceed before a jury on that counterclaim alone.

Dated:  August 20, 2018                              Amit P. Mehta
                                                     United States District Judge